Filed 8/28/20  P. v. Thomas CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVID JON THOMAS,<br><br>    Defendant and Appellant. | H044094<br>(Monterey County<br>Super. Ct. No. SS142197A) |

Defendant David Jon Thomas was charged with sexual abuse of his minor daughter (daughter) and stepson (stepson).[1]  Thomas believed, in the course of his prosecution, that well-connected members of daughter's mother's family—namely daughter's maternal grandmother and grandfather—were exercising influence in the Monterey County District Attorney's office to encourage his prosecution and interfere with his defense.  Thomas also believed that stepson's mother was cooperating with daughter's maternal family members to manufacture or embellish the charges against him.

Believing that he would not get a fair trial under these circumstances, Thomas filed a motion to recuse the Monterey County District Attorney's office and filed three motions pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), asking the trial court to substitute his court-appointed attorney for alternate counsel.  The trial court

---

[1] We refer to the victims and certain witnesses in this case in a manner intended to protect their personal privacy interests, including at times using a generic identifier or only their first name and last initial.  (See Cal. Rules of Court, rule 8.90(b).)

denied these motions, as well as Thomas's subsequent motion to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*). The jury returned a guilty verdict on all counts.

On appeal, Thomas challenges the denial of his *Marsden* and *Faretta* motions as a violation of his rights under the Sixth and Fourteenth Amendments of the United States Constitution. He also contends that the denial of his motion to recuse the District Attorney's office without an evidentiary hearing was an abuse of discretion in violation of due process. Thomas also claims that his trial counsel rendered ineffective assistance in violation of his Sixth Amendment rights. We find no merit in the asserted grounds for reversal and will affirm the judgment.

## I.    BACKGROUND

### A.    PROCEDURAL BACKGROUND

The Monterey County District Attorney filed a third amended information in August 2016 charging Thomas with five counts of crimes committed against the two victims between September 10, 2010 and August 1, 2014, as follows: sex/sodomy with a child under 10 years of age, as to stepson (Pen. Code, § 288.7, subd. (a);[2] count 1); two counts of a lewd act upon a child under 14 years of age, as to stepson (§ 288, subd. (a); counts 2-3); and two counts of a lewd act upon a child under 14 years of age, as to daughter (§ 288, subd. (a); counts 4-5). The information also alleged in separate enhancements that Thomas committed a lewd act against more than one victim (§§ 667.61, subds. (b), (e), 1203.066, subd. (a)(7); counts 2-5). Thomas pleaded not guilty and denied the special allegations.

In July 2016, Thomas filed a motion pursuant to section 1424 to recuse the Monterey County District Attorney's Office from prosecuting the case.

---

[2] Unspecified statutory references are to the Penal Code.

2

The defense argued that a conflict of interest existed within the meaning of section 1424, which authorizes the trial court to decide whether an evidentiary hearing is needed and to recuse a district attorney's office if "the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (§ 1424, subd. (a)(1).) The Attorney General opposed the motion to recuse, and the trial court denied the motion after a hearing.

Between June and August 2016, Thomas also filed three *Marsden* requests to substitute his appointed counsel. The trial court denied each request after a hearing. Thomas then brought a *Faretta* motion to represent himself, which the trial court also denied.

After a jury trial of a few weeks, in which Thomas testified in his own defense, the jury found Thomas guilty as charged on all counts, and found true the special allegations as to counts 2 through 5. At sentencing, the trial court imposed a term of 25 years to life on count 1, consecutive terms of 25 years to life on counts 2, 3, and 5, and a concurrent term of 25 years to life on count 4, for an aggregate prison sentence of 100 years to life. Thomas timely appealed.

### B.    EVIDENCE ADDUCED AT TRIAL

#### 1.    *The Prosecution's Case*

##### a.    *Incident Involving Daughter*

Daughter was six years old at the time of the trial and was found competent to testify. She identified Thomas in court as her father. She stated that she lived with her mom (Aimee T.) and her maternal grandmother (Elizabeth T.) and grandfather (David G.).[3] She has a stepbrother (stepson) who did not live with them but lived with

---

[3] For simplicity, we refer to Elizabeth T. and David G. as daughter's maternal grandparents, though according to the record David G. is the life partner of Elizabeth T. and daughter's putative, not biological, grandfather.

3

Thomas, his wife (Catalina F.), and Thomas's mother (Eugenia), whom daughter called "Grandma Jeanie." Daughter said she loves her father.

Daughter used to visit Thomas at his house. Sometimes stepson and Grandma Jeanie would be there too. One time she saw her father naked in bed. He told her to touch his "private part." She was standing near the bed. Afterward she "ran to the bathroom and washed [her] hands." The stuff that got on her hands was "white." She did not tell anyone because she thought it was a secret.

Aimee T. is daughter's mother. She identified Thomas in court as daughter's father. She and Thomas dated for about six years and were married for one year. She moved into his house which he shared with his mother and grandmother. Thomas and his mother started to experience "demons" and negative energy in certain rooms in the house. Daughter was born in November 2009, and Aimee T. left with daughter in February 2010. She felt "suffocated and restricted" and decided she "just couldn't live like that anymore." She "was concerned with [daughter's] well-being considering the demons and stuff like that" that she had "experienced over the years from" Thomas. Aimee T. later obtained physical custody of daughter, and Thomas had daytime visitation on the weekends. Aimee T. testified that she and daughter live with maternal grandparents.

Aimee T. eventually got to know Thomas's new wife, Catalina F., who helped coordinate the drop-off and pickup times for daughter's visits with Thomas. Catalina F. often would be the one to pick up daughter, or sometimes it was Thomas with stepson or Eugenia. There were no issues around daughter's visitation with Thomas until March 2014.

On Monday, March 31, 2014, Aimee T. accompanied daughter to the bathroom to use the toilet before they left the house. Daughter "all of a sudden . . . started pointing to her private parts and she said, 'My daddy let's me touch here.' " Aimee T. stated that she was "very concerned" but "remained calm." She testified that she asked daughter "two more questions. [¶] . . . [¶] I asked, 'Your daddy let's you touch yourself there or let's

4

you touch him there?' And she said, 'Let's me touch him there.' And I asked, 'Did he have clothes on or no clothes on.' And she said, 'No clothes on.' " Aimee T. did not ask more questions because she "didn't want to alarm her" but she told daughter that she should tell grandmother what she just told Aimee T. Daughter told Elizabeth T. "basically the same thing."

Aimee T. contacted the police about daughter's disclosure. Daughter gave a longer statement to authorities on April 1, 2014. Later that day, Aimee T. made several pretext calls to Thomas at the request of law enforcement. The next evening, she received text messages from Thomas in which he offered to give her 100 percent custody of daughter if she " 'would be willing to drop everything,' " saying " '[i]t's breaking my heart, but I don't think it's going to be good for [daughter] or me or you or any of us to go through a long arduous process. I'm not saying I'm guilty, I'm saying I don't want to fight . . . .' " Thomas's text continued, asking at one point for " 'supervised visit every once in a while . . .' " but stating " 'if you don't want to agree to supervised visits, that's okay. You can have sole physical, sole legal, and I will waive my visitation rights completely.' " In another text from July 2014, Thomas told Aimee T. that he would not contact her anymore and would not try to see daughter " 'ever.' " He asked her to " 'love her for me and say prayers with her for me. . . . She is yours now and this is what I want. . . . Be free, live well, and be in peace. . . .' "

Aimee T. testified that she never threatened to take daughter from Thomas or solicited an offer of full custody. She never told daughter to make up a story about touching her father's penis. She felt "[a]wful" that daughter had to testify in court. She had nothing to gain by testifying at trial.

Aimee T. testified on cross-examination that Catalina F. called her on the day she reported stepson's disclosure, which was about two months after daughter's disclosure. Aimee T. denied coordinating with Catalina F. or talking together about the children's

reports. They did coordinate for Aimee T.'s mother, Elizabeth T., to help Catalina F. change her son to a different school.

Brian Baugh is a deputy sheriff for Monterey County. He took then four-year-old daughter to the Bates Eldridge Center in Salinas on April 1, 2014, for a video and audio recorded interview with county social worker Susan Gleason. Baugh observed the interview. He noted that daughter remained "[c]alm, sitting in the seat[,] . . . [s]he seemed pretty articulate" when talking about her family or things she liked to do. She started moving and jumping around, refrained from making eye contact, and seemed uncomfortable when asked about her dad and touching his private part. Baugh does not have any particular training in early childhood education or child psychology, beyond his police academy training.

Christina Gunter is a sexual assault investigator with the Monterey County District Attorney's office. She interviewed daughter in November 2015 at the Bates Eldridge Center. Gunter described daughter's physical gestures in responding to several questions. Using a diagram that she was shown, daughter pointed to the penis when asked where she rubbed lotion on her daddy. She made a circular motion with her right hand where her thumb touched the tip of her other fingers. She also showed where she stood in relation to his body, on his right side while he lay on the bed.

### b. Incidents Involving Stepson

Stepson was 12 years old at the time of trial and about to begin seventh grade. He identified Thomas in court as "David." He lives with his mom, Catalina F., and previously lived with Thomas from first through fourth grade, after her mother married him, along with Thomas's mother (Eugenia) and grandmother. Stepson did not like living there because he did not feel safe. Thomas would get mad when Catalina F. paid more attention to stepson than to him. Thomas would swear, which scared him, and if he started crying, Thomas would tell him that he would "give me something to cry about" which made stepson think Thomas was going to hurt him.

6

One time when stepson was in fourth grade, Thomas called him to his room. Thomas had sent Catalina F. and Eugenia to the store to buy some things. Thomas locked the door and closed the curtains, which stepson thought was "weird." Thomas was standing next to the bed. He told stepson to take off his clothes, and then he also undressed. Stepson noticed he was "hairy, like a monkey." Thomas laid a towel on the bed and had stepson lie flat on his stomach, on top of the towel. Thomas "put his penis inside [stepson's] butt hole" for what "felt like it was a while." Stepson felt "pain." Thomas "wouldn't let" him get away. Thomas was "holding" and "kind of pushing [him] down." Thomas stopped when Catalina F. called on the cell phone. He told stepson to get dressed and "don't tell" his mom. Stepson was scared that Thomas would hurt him, so he put his clothes on and "pretend[ed] nothing happened."

Stepson described another time when Thomas made him use his hands on Thomas's penis. He made him "keep on doing it" until "[s]omething white" "shot out" of Thomas's penis "like a volcano." It went on stepson's glasses and on his lips. Thomas cleaned it up with a towel. Thomas made stepson take a shower with him. Stepson described another time that Thomas "put his mouth" on his penis.

Stepson did not initially tell anyone because he "didn't know what was [*sic*] I should say." He and his mom eventually moved out of the house, which made stepson "quite happy." After he and his mother were out of Thomas's house, stepson reported what had happened. Thomas was his stepdad but "how he acted didn't really feel like a real dad."

Nurse Practitioner Sheree Goldman, the coordinator of the Monterey County sexual assault response team, testified as an expert in forensic sexual assault examination. Goldman explained that a non-acute exam is a forensic exam where the assault event was not recent. She described the factors that might affect whether there is injury to the anus in a case of a male child victim and what research has shown about the likelihood of residual injury or scarring. Goldman testified based on the report of stepson's

examination that stepson described three times when he was 10 years old in which his stepfather did things to him. " 'He touched my butt with his pee-pee.' " " 'He put it deep inside . . . and it hurt real bad.' " Stepson said that he " 'yelled' " and " 'told him to stop but he wouldn't listen.' " Stepson also said, " 'When he pulled it out of my butt the white stuff came out.' " Stepson reported having a " 'real sensitive spot in my butt.' " Stepson's sexual assault examination revealed nonspecific redness around the anus on the outside but no injury.

The examination report also contained stepson's description of two other acts by his stepfather. These were, " 'He made me put my hand on his pee-pee' " and " '[w]hen I did that white stuff shot out of it.' " Also, " 'He put his mouth on my pee-pee, he sucked on it, he bit it, but it didn't bleed.' " Stepson said that Thomas told him not to tell anyone and made him take a shower after the first time, which was "weird and [stepson] didn't like it."

Catalina F. is stepson's mother. She testified that she met Thomas around 2010 and they began dating shortly after. She had been living with a family, and he offered that she and stepson could move into a trailer of his. Thomas moved into the trailer about a week later. She found out that he had a daughter after they were living together. Thomas told her that it would be easier for him to get custody of daughter if she married him. She married Thomas after about five months, in June 2011.

They moved from the trailer into the house next to the trailer, on the same property, in 2012. Catalina F. began to help with daughter's custody exchanges and eventually became the primary person who would pick up daughter and return her. Stepson would be at the house during those times, as well as on the weekends when Catalina F. would leave to run errands. She was the primary shopper for the household. Thomas's mother, Eugenia, would always come with her.

Everything was "fine" when they moved into the trailer but it changed when they moved to the house. Catalina F. noticed behavioral changes in stepson from a "[v]ery

8

happy, driven, playful kid" to sadder, less confident, and less talkative. He began eating more and gaining weight. Thomas would sometimes grab stepson by the head and shake him, or would grab him and raise his fist toward him, and would spank him with an open hand. He would call him a liar and would become more aggressive when Catalina F. would try to intervene. He also would comment on stepson's body by saying he "has a big butt."

Catalina F. became aware of an issue between Aimee T. and Thomas in March 2014, because Thomas was in his car on the phone for hours and told her that it was about daughter who was having problems at school. She accepted the explanation but then "more things start[ed] coming out." Catalina F. insisted that he tell her what it was about, and he said that Aimee T. was trying to have daughter say that he had touched her. He denied doing it but Catalina F. was not convinced. Catalina F. testified there were times that daughter would be alone with Thomas.

Thomas began changing things in the house, including that he took the blankets off the bed in their bedroom, repainted the bedroom from white to blue, and removed the television. He tried to tell his mother that the bedroom "always has been blue" and made her repeat it three to four times. He did the same to Catalina F. and to stepson. Around the same time that he was changing the bedroom, Thomas asked Catalina F. to write a statement to defend him. She told him to do it himself, but he made her do it and told her " 'you fucking bitch, you have to do it.' " She became afraid and did it. She typed several paragraphs for Thomas but never signed the statement. The document shown at trial had several pages and statements added to it that she testified she had not typed.

Catalina F.'s relationship with Thomas had started to deteriorate in early 2013, before the allegations about daughter. She decided to leave Thomas because of his treatment of her and of stepson, but she had to wait until she finished school and got a job. He had begun calling stepson a liar and an idiot, yelling at him, and physically grabbing him. Stepson appeared to be afraid of Thomas, did not want to talk, was sad

and lacked confidence, and did not want to go to school. When Catalina F. asked stepson about what was happening he seemed "scared" and would not look at her in the eyes, which was "very uncommon" for him.

Catalina F. began looking for a job in December 2013 and found work in August 2014. Catalina F. packed her car when Thomas was not home, took stepson, and left. Stepson was excited to leave. She continued to ask him if something happened to him or if there was something he was not telling her. He would tell her "it was nothing" and seemed like he "didn't want to talk about it."

On August 16, 2014, Catalina F. repeated that she was worried for stepson and really needed to know and wanted him to talk to her. She testified that while still playing with his Legos, he said " 'Mom, I'm afraid to told [*sic*] you of this.' " He then "start[ed] telling me everything." He told her that Thomas grabbed his butt cheeks and he started touching him, that when she would go to drop off daughter Thomas would call him to the bedroom and lock the door, and that Thomas would have him pull his pants down and Thomas even bit his penis. He also told her that Thomas put his penis inside him and that it hurt him. She told stepson that "what you have told me right now, I need you to talk to the police about this. I'm going to call them. And that's what I did."

On cross-examination, Catalina F. testified that Thomas's mother, Eugenia, and grandmother, Mary, were retired and for the most part present at the property. Thomas had a job as a bank security guard for the years they lived together. Catalina F. was the one who transported stepson to and from school. Stepson told her that his "butt hurts" in early 2014. He was embarrassed and said he did not know why; he did not want to see a doctor and she figured it was from constipation. Stepson seemed to get along okay with Eugenia, who sometimes helped with errands or meals.

On redirect, Catalina F. testified that when she asked Thomas about daughter's allegations, he always told her "No. . . . Fuck you, bitch. You think I would do this to my daughter?" When police came to the house to ask her about daughter's allegations,

10

she did not speak to them because Thomas had told her not to. She did not talk to Aimee T. about daughter's allegations before leaving Thomas's house in August 2014. She asked stepson if he had seen anything between Thomas and daughter, and he replied that he did not see anything. After stepson disclosed to her, she sent Aimee T. a text saying that after what stepson told her, she believed everything that happened to daughter was true.

Kim Smith is a detective with the Monterey County Sheriff's office. She observed stepson's interview, conducted by Social Worker Alberto Camacho, on August 22, 2014, at the Bates Eldridge Center. Stepson was 10 years old at the time. During the interview, stepson told Camacho that he did not want to talk about "what happened to his butt." He instead showed with his hands "by making his two fingers going in a circle and his other finger inserted" and moving the inserted finger inside and outside the circle. Stepson pointed to the penis and the butt on the diagram when he said " 'this on this.' " Stepson showed being grabbed around his hips, on the small of his back. He looked away from Camacho when describing the white stuff that shot out of the private part. He gestured toward a children's counting puzzle in front of him when Camacho asked him about the number of times that the incidents had happened.

### c. *Expert Testimony on Child Sexual Abuse Accommodation Syndrome*

Dr. Anthony Urquiza is a psychologist, professor of pediatrics, and director of a child abuse treatment program at a university medical center. The trial court recognized him as an expert in child sexual abuse.

Dr. Urquiza testified that there are five aspects of child abuse accommodation syndrome, which describes "a pattern of events or characteristics that tend to co-occur." These are secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction or recantation.

11

Most often, a child is sexually abused by somebody who is familiar and with whom they have an ongoing relationship. That person is usually in a position of authority or control over the life of the victim. Kids may not report sexual abuse because they are threatened or intimidated by the perpetrator, even where the threat is not overt. Kids may be afraid that disclosure will result in a bad thing for their family. Research shows that it often takes months or even years for kids, both male and female, to disclose abuse.

Because the victim is being abused by somebody they know, who has control and ongoing access to them, the child usually has no recourse other than to be victimized. Kids may not understand sexual abuse and do not understand adult erotic sexual behavior or how to talk about what is happening.

Entrapment describes the cycle of being abused, being unable to tell anybody because it is a secret, and being helpless to stop it from happening again. Accommodation refers to the coping mechanism that develops when a child is powerless to stop the abuse; the child may dissociate or emotionally disconnect from the feelings or the experience of abuse. Though most victims are able to remember what they see, it may be difficult for them to overcome the sense of embarrassment or shame and to talk about it. They are less likely to remember the details of what was happening peripherally. Talking about the event later in court and perhaps seeing the perpetrator for the first time since the disclosure may make it even more difficult to talk about it.

The notion that a mother can recognize her child is being abused has been refuted. Sexual abuse "happens behind closed doors, outside of people's awareness" and "kids get sexually abused in coercive ways that other people just don't know about it." The last aspect of the accommodation syndrome is retraction, where in some cases a child who discloses the abuse later takes back the allegation.

Dr. Urquiza explained that sexual abuse must be understood as a relationship. "[T]o understand the affect that sexual victimization has on kids you have to understand the motivations and . . . the distortions that perpetrators have . . . ." It is a myth to

12

presume that an offender of a certain sexual orientation will victimize only according to that orientation.

Dr. Urquiza's testimony was limited to the child abuse accommodation syndrome and his experience working as a psychologist with kids who have been abused; he knew nothing about this particular case, the defendant, or the victims.

        *d.*        *Investigation by the Monterey County District Attorney's Office*

Christina Gunter interviewed stepson on the same day as she interviewed daughter, though at a different time so the children were not present around one another. Gunter described stepson's gestures and movements while talking about the incidents. Stepson arranged the diagram of the boy front-down and placed the diagram of the male on top, then showed with his right and left hands, palms facing down on each butt cheek, pulling the butt cheeks apart. He did not look at Gunter during the disclosure, especially when talking about the penis touching his butt. Instead, "his head would go down and he scrunched himself under the table more. I couldn't see his hands anymore." Stepson also showed with his mouth how the defendant used his mouth on stepson's penis, moving his head back and forth and making a sucking, gagging sound. He similarly showed how he used his fingers and hands to masturbate the defendant's penis, and where the defendant's hands were as he lay on the bed.

Gunter acknowledged, on cross-examination, that certain comments made by a child might be gleaned from what adults say at home. She did not form an impression that he was parroting anyone in describing the alleged sexual abuse.

        *2*.      **The Defense's Case**

Dr. Roberto Flores de Apodaca testified as an expert in forensic clinical psychology regarding molestation as it relates to adult or juvenile offenders. Dr. Flores practices forensic psychology, evaluating people in legal cases on issues of mental status. He has testified in over a thousand legal cases split about evenly between prosecution,

13

defense, and court appointments. In sexual molestation cases, Dr. Flores evaluates only the alleged perpetrators.

Dr. Flores evaluated Thomas in-person for several hours on behalf of the defense case. He spoke with him about his background, took a social history, and administered a psychological test. Dr. Flores also reviewed the charges against Thomas, the preliminary hearing testimony, and police reports. Thomas was cooperative, answered questions directly, and participated in the psychological testing, which produced "reliable and interpretable" results. The test that Dr. Flores administered is designed to identify a person's "persisting sexual interest," referring to the category of individuals the person is sexually responsive to—whether adults, adolescents, school age, or toddlers. Although there are those in the field who maintain questions about the test's methodology, "the growing and substantial level of opinion on this particular test is that it is valid . . . , particularly where . . . there's an incentive to be less than fully honest and fully forthcoming." Thomas's test results were "that he has persisting sexual interest in adult and adolescent females only, not in males of any age or in prepubertal females." Dr. Flores agreed on cross-examination that the test does not assess underlying motivation for alleged conduct, such as conduct based on power or control, but it would tell whether the defendant "has a persisting interest in children or . . . not." All factors indicated that Thomas's test reflected meaningful participation.

Eugenia Thomas (Eugenia) is the defendant's mother. Thomas always lived with her at their home in Salinas, along with her mother, Mary Dennis. Aimee T. lived with them for a time, then left with daughter when daughter was still "little." Eugenia would see daughter on Saturdays and Sundays. Aimee T. wanted things for the baby done a certain way, which "made it very, very hard on us" though they "did everything" they could to appease her. Eugenia was always around the house including during daughter's visits. She never saw Thomas act in any way sexually inappropriate towards daughter.

14

Eventually Catalina F. and stepson began living with them.  Eugenia slept in the living room on the couch because of back problems.  Stepson slept in the living room too.  They would watch television and chat.  They grew close, and Eugenia loved stepson and would take care of him.  If stepson acted out, Catalina F. would discipline him and was "very harsh," so Thomas would talk to him and "try to teach [him] the right way . . . ."  Stepson did "not really" complain to her about the way Thomas treated him.  They seemed to get along and enjoy each other's company.  Eugenia was surprised when Catalina F. left suddenly with stepson in August 2014 and "thought maybe she was kidnapped."  Eugenia never saw Thomas act in a sexually inappropriate manner towards stepson.

Eugenia testified on cross-examination that since Thomas's arrest, she hears from him about twice a day if she's lucky and also visits him every Sunday.  They never talked about the allegations against him.  She confirmed that the room Thomas shared with Catalina F. was white, and Thomas painted it blue after April 2014.  They also painted the living room and bathroom.  She stated that Thomas was not home when she would go with Catalina F. to pick up daughter for visitation, because he was working.  She denied that there were times that she would leave with Catalina F. and stepson would be home alone with Thomas.  She said that stepson was "always" with her.  She went shopping with Catalina F. "very, very, very few" times, like "maybe one."  Thomas was never alone with stepson or with daughter.  She denied telling the police, when they came to the house in April 2014, that Thomas told her not to talk to them.

Kaylee L. knew Thomas as a family friend.  She was 15 years old at the time of trial.  Her mother was friends with Thomas's ex-wife Catalina F., and they met Thomas through her.  Kaylee L. knew stepson and also knew Thomas's daughter "a little."  She and her family often got together on the weekends with them to see a movie or go swimming.  She described Thomas as "kind of like an uncle-type figure" who was nice and fun.  Her opinion was that Thomas was proper with children.  She did not hear what

15

daughter and stepson said that Thomas did.  Hearing the allegations against him would not change her opinion about Thomas.  She testified on cross-examination that she did not know that her mom was romantically involved with Thomas.  She believed that the children accusing him "are very young" and "were influenced."

Nancy Ferracane knows Thomas as a friend.  Ferracane met him while he and Catalina F. were dating.  After Catalina F. moved in with him, they became "good friends . . . like a family."  Ferracane became briefly romantically involved with Thomas.  The families would get together every other weekend for outings and activities.  She would bring her two daughters, and Catalina F. and Thomas would bring stepson and sometimes daughter.  Ferracane never saw Thomas alone with stepson.  She stated on cross-examination that she does not know what he does when he is alone with daughter.

Thomas testified in his own defense.  He was 43 years old at the time of trial.  In 2014, he was working as an armed security guard at Bank of America.  Daughter was born in 2010.  Aimee T. left when daughter was about five months old.  They later mediated shared legal custody and 15 percent physical custody so that Thomas had daughter for two eight-hour days every weekend.  He did not try to change the custody arrangement but had understood that it would change to include overnights and 50 percent physical custody when daughter turned five in November 2014.

However, in April 2014, Aimee T. called Thomas and told him daughter's allegations.  Aimee T. said that daughter had made the statements, but he felt throughout the conversation that they came from Aimee T.  Thomas was in his car and had just pulled into his driveway when he received the pretext call.  There were actually three pretext calls that afternoon, lasting a total of about three hours.  He just sat in the car after because he "couldn't believe it."  Catalina F. came to the car trying to figure out what was going on.  Once he returned to the house and composed himself, he told her what Aimee T. had said.  He was "nervous" and "kind of freaking out."  At some point that evening he also told his mom, Eugenia.

16

Thomas confirmed that he sent Aimee T. the text messages later that night. He had thought about giving up daughter even before the allegations were made. Thomas explained that maternal grandparents "had a monumental influence" on his decision to want to terminate physical custody. He said that the grandparents, especial Elizabeth T., showed in many ways that they "wanted" daughter even when she was "still in the womb." He texted Aimee T. offering to give up physical custody of daughter because he was "afraid." Thomas explained that maternal grandparents "were very powerful influential people" who had wanted Aimee T. to leave him "for the sole purpose of getting full custody of my daughter." Thomas was afraid of them; they had the "power of the law" and "influence" in the system including the sheriff's department.[4] He was afraid that they would prosecute him and take away his daughter. They had always scrutinized everything Thomas did with daughter, from "the way she looked when she came back [from visitation], what she was wearing, where we went, what we would do, if we were even five minutes late." He felt he was "under a microscope." It put a lot of pressure on him and his family.

Thomas felt that Aimee T. was trying to "entrap" him into saying something during the pretext phone calls. She was vague with her questions and did not clarify what she understood from daughter's statement that " 'Daddy lets me touch here.' " He at some point started suggesting scenarios that might have led to daughter's statement, like maybe having seen him in the bathroom peeing. He also mentioned to Aimee T. his skin issues (psoriasis, eczema, and dermatitis), which she already knew about. He explained to the jury that he has to apply a Cortisone cream, which is white, on his penis around the head and the shaft, inside the urethra, in the crotch area, between his butt cheeks, and on

_____

[4] The trial court struck portions of Thomas's testimony during his examination in which he offered the fact that maternal grandparents were employed with the Monterey County District Attorney's office. We discuss the conflict of interest issue in detail in the Discussion, *post*.

17

his scalp and ankles. He also would inject antifungal medication into the urethra and squeeze it as far as he could to the base of his bladder, which process he described to Aimee T. during the call.

He further testified that there was one time that involved daughter. It was in the morning and he had gotten out of the shower. Catalina F. and Eugenia must have just returned from picking up daughter. Catalina F. must have not locked the door when she left the room. He was lying on his bed on his back with his towel open. He had just applied the medication and his penis was erect. If the penis is flaccid, most of the medicine stays in. But if the penis is erect when he puts the medicine in, about 90 percent comes back out. Daughter came in just after he had put the medicine in. He saw daughter's face. Her facial expression was "not good." He covered himself immediately. She did not touch him in any way. She was "scared" to come hear him. He did not talk to her about the incident, but after that he began letting her put medicine on his ankle to try to show her that it was helping him. He told her that it was medicine. She would apply it with her fingers, and he would take her to the bathroom and wash her hands. He would be wearing shorts and a shirt.

Thomas testified that daughter never would have seen him masturbate but might have seen him having sexual relations with Catalina F. He did not have her masturbate him or touch his penis in any way.

Thomas testified that Catalina F. and stepson moved to the property in 2010. He was stepson's stepfather through 2014. Catalina F. was in charge of discipline if stepson acted out. Thomas did not approve of her way of disciplining. She is "from Costa Rica and doesn't know the laws here as well as an American citizen would . . . ." She would slap stepson in the face or make him sit in the kitchen on the floor without dinner and threaten to send him back to Costa Rica, to military school. She would spank him with his pants and underwear all the way down "really hard, more than three or four times, sometimes ten." Thomas said that he spanked stepson himself "maybe twice" in the

18

years they lived together, but with his underwear and pants up. Everything happened in front of his mother, Eugenia. It was not behind closed doors.

Thomas denied grabbing stepson and shaking him to punish him. He got along "fine" with him in the spring of 2014, though he believed stepson was not "okay." Stepson "would have panic attacks and he would see things . . . and hear things" that Thomas did not see or hear. Stepson would "panic" and "go into a different mode . . . ."

He denied that Catalina F. and Eugenia would leave the house, leaving him alone with stepson. Thomas's grandmother Mary was always there. There were only two times that Thomas recalled his mom and Catalina F. leaving to go shopping while stepson stayed behind. Both times stepson had asked if he could stay home and watch television, and he stayed in the front room with Mary. When it was time to take daughter home in the evening, everyone would generally go together, except for Mary who would stay home.

Thomas denied ever calling stepson into his room alone. He never called him into the bedroom, shut the door, and locked it. He never had him lie on the bed or take his clothes off. Stepson has never seen him masturbate or ejaculate, and he never touched stepson's penis or anus. He testified that he never committed any of the sex acts that stepson described and never touched him inappropriately. He did not shower with stepson, other than to rinse off chlorine after the pool. There were times that Catalina F. would stand in the bathroom while stepson showered to make sure that he cleaned properly, and Thomas was standing there too.

When Thomas spoke with Catalina F. about daughter's allegations, she never asked him whether he had done something to her son. She left without telling him. Their relationship had been falling apart "in bits and pieces" starting with him "catching her in a lie." Between April and August 2014, the relationship was "[h]orrible." Stepson "was a big part" of the marital issues but not because of anything related to the allegations, which Catalina never discussed with him. Thomas was so surprised by her

19

leaving that he thought she had been abducted and called the sheriff's office. The officers came and verified that Catalina F. had left him.

Thomas testified on cross-examination that when his work schedule interfered with daughter's pickups or drop offs, Catalina F. and Eugenia and stepson would usually go together. On Sundays, they would all go together to pick up daughter and then go to church. After the pretext calls from Aimee T. in which he first heard daughter's allegations, a deputy called him saying that Aimee T. had temporary full custody of daughter. He then spoke with a criminal and family lawyer and texted Aimee T. offering to give up custody of daughter.

Thomas explained the reasons that he thought he needed to give up daughter. It was not the first time there was a false allegation. When daughter was around six months old, Aimee T. and maternal grandmother reported that he had slapped Aimee T., who was immediately given full temporary custody of daughter. The claim was dropped but he had to hire a lawyer and go to mediation to regain custody and visitation. So he was "constantly worried" they would take daughter again and was on "pins and needles" the entire time she was with him, afraid he was "going to get prosecuted by them for something . . . because of who they are" and that daughter would be taken away. He realized that "[h]e didn't have the money to fight" and it "would have been an uphill battle" to try to get custody again after the allegations had been made.

Thomas testified that he had already planned to repaint the bedroom and other rooms blue before the allegations. He asked Catalina F. to type a declaration but did not tell her what to type. He saw Catalina F. being physically abusive of stepson "[m]any times."

C.    VERDICT

The trial court instructed the jury on the applicable law, and the jury returned a guilty verdict shortly after on all counts. Thomas timely appealed.

20

## II. DISCUSSION

Thomas's contentions on appeal revolve around a central theme, which is his belief that a conflict of interest with the Monterey County District Attorney's office undermined the legitimacy and fairness of his prosecution and his trial. Thomas raised the issue in pretrial proceedings and tried to raise it at trial.

In short, Thomas believed that daughter's maternal grandmother, Elizabeth T., and her lifetime partner David G., used their professional connections in the district attorney's office and the legal community, and their familial connections with daughter's mother, Aimee T., to influence the prosecution and ensure that Thomas would never gain custody over daughter. As a result of the close working relationship between the offices of the county district attorney and the public defender, Thomas believed the conflict of interest adversely affected his defense. Thomas argued that the Monterey County Public Defender's Office saddled him shortly before trial with a deputy public defender who was assigned to the case only because he did not know Elizabeth T. or David G., and who Thomas believed was incapable of defending him effectively.

Thomas advances three independent grounds for reversal. We first address the three *Marsden* requests to substitute Thomas's appointed public defender for new counsel and the *Faretta* motion to represent himself at trial. We next consider whether the motion to recuse the Monterey County District Attorney's office required an evidentiary hearing. Last, we turn to the contention that Thomas's trial counsel deprived him of his Sixth Amendment right to the effective assistance of counsel.

### A. *DENIAL OF MARSDEN AND FARETTA MOTIONS*

Thomas contends that the trial court's denial of his *Marsden* and *Faretta* motions violated his constitutional rights to the assistance of counsel under the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution and to due process under the Fourteenth Amendment of the United States Constitution.

21

### 1. *Relevant Background and Procedural History*

#### a. *First* **Marsden**

Thomas made his first *Marsden* motion on June 7, 2016, before Judge Larry E. Hayes. His jury trial at the time was set for June 20, 2016. About three weeks before the scheduled trial, Thomas learned that his appointed counsel, Monterey County Deputy Public Defender Thomas O'Keefe (who had been the fourth deputy public defender assigned to his case) was reassigned to the civil calendar of the public defender's office. Thomas's newly-assigned deputy public defender was Steve Prekoski.

Thomas said that Prekoski was immediately dismissive of his concerns about the proximity of the trial, the conflict of interest with the prosecutor's office, and the complexity of him facing "two complicated cases." Prekoski refused to request a continuance for additional time to prepare for the trial, apparently stating that "[w]hether it's three weeks or five years, it won't matter." Prekoski "shot down" the motions that Thomas said his other attorneys had agreed were "critical" to his case. This included a motion to recuse the district attorney's office, which Prekoski told Thomas " 'will never happen.' " He also indicated that he would not move to sever the cases of daughter and stepson, contradicting the advice that Thomas received from his former attorneys and from a private attorney he had retained for legal advice.

Thomas believed there was a conflict of interest arising from "the whole D.A.'s office and the Public Defender's office, knowing [maternal grandparents], and wanting to avenge them or make an example out of me . . . ." He claimed that the conflict of interest extended to the public defender's office, which had assigned his attorneys based only on whether they knew Elizabeth T. and David G. and not based on qualifications or experience. He "got pushed . . . from public defender to public defender" due to the conflict, and when his former lawyer, O'Keefe, started helping him "too much," he was taken off the case just three weeks before trial. Thomas therefore asked the judge to

22

appoint counsel from the alternate defender's office to represent him, someone "outside the influence of the D.A.'s Office and the Public Defender's Office."

Judge Hayes noted that all the defense attorneys "have some form of relationship" with the district attorney's office and even an attorney from the alternate defender's office could have some acquaintance with maternal grandparents. The court explained that it was not possible for the court to "attorney shop[]" to find someone who does not know them, but that all attorneys have an ethical obligation to him as their client. The court reminded Thomas that he was always allowed retain his own, hand-picked counsel.

Prekoski addressed the conflict-of-interest complaint by stating that of all the attorneys assigned to the case, he had the most experience and least exposure to the district attorney's office and maternal grandparents. Prekoski explained that he did not know either Elizabeth T. or David G., and though he has been a deputy public defender for 14 years, he had only been in the Monterey office since October (2015). He pointed out that none of Thomas's prior attorneys filed a motion to recuse the district attorney's office, from which he inferred based on their ethical obligations that they did not believe there was a meritorious basis for the motion. He noted that Elizabeth T. had been retired from the district attorney's office for a number of years and was going to be a percipient witness in the case. Because she and David G. were not involved personally in the case, Prekoski was skeptical that a recusal motion or motion for change of venue would have merit, which he had tried to explain to Thomas during their meeting.

Prekoski also responded to Thomas's complaints about the motion to sever and the option to seek a continuance. He had tried to explain that a severance motion lacked merit and would not be successful, because even if the cases were severed, the evidence pertaining to each child would be cross-admissible in the other case under Evidence Code section 1108. Regarding a continuance, Prekoski had initially expressed that he " 'could go to trial on June 20th, if [he] felt like [he] could be prepared.' " But he had since

23

determined that he could not be prepared for trial by then and, depending on the outcome of the *Marsden* request, intended to file a motion to vacate the trial date.

Prekoski told the trial court that by the time he arrived on the case, Thomas had a very negative opinion of his treatment by the public defender's office. Prekoski's attempt to communicate about the recusal or severance motions and to have "meaningful conversations with him about the merits of the case, . . . evidence that he said he hadn't seen, things of that nature" further frustrated Thomas who decided he did not want to talk to Prekoski. Thomas was "absolutely refusing to participate in his own defense." Prekoski stated that he needed Thomas to engage in "meaningful discussion" with him about the case and was "fully prepared, fully equipped, fully experienced and fully willing to litigate" the case and represent Thomas.

Thomas reiterated that he did "not trust" Prekoski and would "not go to trial with him." He emphasized that his case needed more time for discovery, for motions that had not been filed, for witnesses who had not been subpoenaed, and for additional investigation into critical defenses.

The trial court denied the *Marsden* motion. Judge Hayes explained that Prekoski's legal advice to Thomas appeared to be sound. Though Thomas may not have liked what he was told, his dissatisfaction and the relationship between the district attorney's and public defender's offices were not grounds to appoint a new attorney. The judge rejected the possibility of an attorney from out of county and noted that none of Thomas's other attorneys, including private counsel, actually filed for recusal of the district attorney's office. The trial court encouraged Thomas to have a "good dialogue" with Prekoski and to cooperate in his efforts to prepare for trial. Judge Hayes stated that it would consider the merits of a motion to continue if Prekoski filed one.

### b. *Second* **Marsden**

Thomas made a second *Marsden* motion on August 2, 2016, before Judge Andrew G. Liu, to relieve Prekoski as his counsel and appoint an attorney from the alternate defender's office to represent him.

Thomas explained his representation during the nearly two years since his arrest. He first retained private counsel, then ran out of money and was assigned a series of deputy public defenders, all of whom had treated him unfairly, other than O'Keefe, who was on the case for a year before he was suddenly reassigned. According to Thomas, the public defender's office had failed to provide him with adequate representation by experienced counsel with expertise in the charges he was facing. Thomas's goal for the *Marsden* was to obtain the appointment of counsel from the alternate defender's office. Thomas believed that private counsel would not have the same institutional biases and would be independent of influence by the district attorney's office.

Thomas provided a detailed account of his grievances with the public defender's office and with Prekoski. He complained that the attorneys assigned to him had not investigated what was needed for his defense and had lied continuously to him about their reasons for refusing to seek a change of venue or severance of the two cases. Prekoski refused to file the motions that Thomas wanted. Although Prekoski finally filed a motion to recuse the district attorney's office, Thomas believed the motion was filed incorrectly and was poorly executed. Also, Prekoski did not move to disqualify Judge Liu so that Judge Hayes could hear the motion. Thomas stated that Prekoski lied to him about why O'Keefe had been taken off of the case. Thomas also complained that Prekoski had not subpoenaed witnesses needed for the defense and had failed to "impeach" witnesses like Aimee T., Elizabeth T. and David G. Thomas wanted Prekoski to subpoena an ex-husband of Catalina F. named Curt W. who would testify that she had used him to obtain her United States citizenship before accusing him of child molestation and abuse, that she may have murdered someone in Costa Rica before coming to this country, and

25

that her interest in getting Thomas jailed and out of the way was related to "millions of dollars at stake" in property.

Thomas stated that Prekoski refused to read all of the paperwork that Thomas gave him, failed to show up to three of six scheduled attorney visits, and would get angry and yell at Thomas during their meetings. Thomas had to "beg and plead" to see bits of the discovery in the case, and Prekoski had not informed him of the witnesses he had subpoenaed or shown him the evidence against him. He felt that Prekoski lacked adequate experience and that their communication and relationship was "beyond repair." He believed that if he had the ability to hire a private lawyer, none of these injustices would be happening to him. Prekoski was acting as a "surrogate prosecutor" in many ways because he was siding with the prosecutor and telling Thomas that his evidence was "worthless." Also, someone in the public defender's office was discarding materials faxed to Prekoski by Thomas's mother, who tried sending them multiple times only to find them in a trash bin.

Prekoski stated that he was reluctant to engage in a lengthy refutation of Thomas's allegations, because he did not want Thomas to feel that he was advocating for or against keeping his case. In response to the concerns about the quality of the defense's investigation, Prekoski noted that the assigned investigator for the public defender's office had been with the case "since well before" he had. The investigator interviewed all the witnesses identified by Thomas and prepared witness statements. Prekoski intended for most of those witnesses to testify at trial, except for Thomas's grandmother who was over 90 years old and whose testimony was likely to be duplicative of his mother, Eugenia. Prekoski also retained two experts who were prepared to testify on behalf of Thomas.

Prekoski determined for tactical reasons not to offer certain other witnesses Thomas had identified. Prekoski explained that just six days before the trial, he received eight telephone calls from Eugenia, who stated that she met with an individual (whom

26

she did not identify) who told her that he learned from another person that Catalina F. had fled Costa Rica to escape detection for a murder she committed there. Prekoski stated that he performed a brief relevancy analysis and told Thomas that he found the allegations "relatively foundationless" and " 'incredible' " but would bring a motion to continue if more credible information surfaced that was not hearsay and more relevant to the facts in controversy.

Prekoski explained to the trial court the purported relevancy of the allegations against Catalina F. from his client's perspective. Thomas had submitted a bottle of tanning oil to the defense, which he believed Catalina F. had been slipping into his food to try to poison and kill him. This would show that she was committing crimes of moral turpitude and was capable of influencing the testimony of her son against Thomas, similar to how she had falsely accused her ex-husband in the past. Prekoski said that he was prepared to use some evidence provided by Thomas to impeach Catalina F., including a declaration from her earlier divorce which intimated a possible, prior issue of molestation by her ex-husband. The relevancy of the evidence would not be "about a grand conspiracy" but would be for the jury to consider "how the child would have the vocabulary of molestation without having ever been molested by my client." Prekoski had that document "at the ready, prepared for impeachment." Otherwise, Prekoski was "reluctant to proffer a defense to multiple-victim child molestation that has . . . little to do with answering to the charges, and more to do with the conspiratorial global blaming of everyone else."

Thomas interjected that Prekoski was a "Surrogate prosecutor." Prekoski acknowledged that in trying to convey to Thomas the difficulties in representing the best interest of a client facing these charges, he "may well have sounded prosecutorial" because he had formed an opinion—due to the potential sentence Thomas was facing— that they "ought to discuss resolution." Prekoski also tried to express to Thomas that "it may well be counterproductive to mount the defense that he intends to mount, and that he

27

should consider factors of likeability" in pointing fingers at people who appear to the jurors "to be perfectly reasonable and . . . normal people." Prekoski emphasized that although he had many conversations with Thomas about whether to take the case to trial, he "always told him it's his decision, that he's driving that bus." Prekoski said he believed there were "dangers in mounting the defense" that Thomas wanted to mount, but "[w]ith minimal exception" he was prepared to mount that defense.

Prekoski admitted that he and Thomas had "a strained relationship." The communication between them was "difficult" and they disagreed "every time" they spoke. It was clear to Prekoski that Thomas lacked faith in his ability as a trial advocate. Prekoski said that Thomas had "a really difficult time" accepting his experience with the concept of relevance and the fact that "there are several danger zones of evidence in this case that are, frankly, not going to be acceptable testimony at trial for either side."

The trial court denied the *Marsden* motion. Judge Liu observed that Prekoski was performing his defense attorney role, which required looking "at the case from all sides" to determine what the defense would be facing at trial, assessing whether the case should be negotiated and how a jury would likely react to certain evidence, and fulfilling his ethical obligation to tell Thomas "all the bad news" about the evidence against him. Judge Liu likened it to a patient-doctor relationship, where the doctor has to inform the patient of the severity of the diagnosis while proposing ways to fight or defend against it.

Judge Liu told Thomas that he understood the issues Thomas was facing and that he had represented individuals in Thomas's situation before. He emphasized that a good attorney-client relationship meant having faith in the attorney, which for Thomas was hard because he had liked O'Keefe and was not getting along with Prekoski. But Judge Liu stated that it was "clear" that Prekoski had a strategy, focus, and foresight. He explained that what he was seeing was "not inadequacy of representation. Not by a long shot . . . . What I'm seeing is more of a difficulty in understanding his role and how he's going about it."

28

Thomas responded that Prekoski "puts on a very good show" in front of a judge but was merely "rearranging the things that make it seem like he's very good and he's doing the correct job for me and he's working hard for me . . . ."

Judge Liu reiterated that Thomas may have been misunderstanding his attorney's role and that he had an attorney who was fighting for him. He found no material conflicts. "To the extent there are conflicts . . . they're conflicts of perception mostly." Judge Liu also found that "any deterioration in relationship . . . , to some degree, rests with Mr. Thomas . . . ." The trial court denied the second *Marsden* motion.

### c. *Third* Marsden

Thomas made a third *Marsden* motion on August 8, 2016, asking that Judge Hayes either discharge Prekoski and substitute O'Keefe, or appoint an attorney from the alternate public defender's office. Thomas stated that if the court were to deny his motion, he would want to represent himself, with assisting counsel for the legal issues and with a private investigator.

Thomas listed the following ways in which Prekoski had failed to provide adequate counsel: he had lied many times about his experience defending sex offense cases and had been trying to convince Thomas to take a plea deal because he was going to lose at trial and was facing 136 years to life; he would get angry and yell, and was hostile toward Thomas because he had filed three *Marsden* motions; he was not qualified to try the case and was chosen only due to the conflict of interest with the district attorney's office; he filed a "botched recusal" motion which Thomas knew he was going to lose because it failed to focus on the fact that daughter was living with maternal grandparents, who could influence her against him and use their positions of power to influence the district attorney's office and public defender's office; he also refused to exercise a challenge against Judge Liu, who denied the second *Marsden* motion and was not familiar with the case like Judge Hayes was; and he had not prepared Thomas for the

29

trial, had not shown him the video interviews of daughter and stepson, and kept discouraging him from filing the *Marsden* motions, stating no judge will grant them.

Thomas also believed that Prekoski refused to represent his best interests, including by refusing to speak with witnesses whose testimony was "critical and pertinent" to the defense. Thomas said that a close friend of his family was waiting outside the courtroom and was a best friend of Catalina F.'s ex-husband. The ex-husband was willing to testify and would discredit Catalina F. by saying that she had tried to get his money and his property, had tried to kill him while he was asleep, and had later accused him of molesting stepson, as she did with Thomas. He also would testify that Catalina F. had a criminal background in Costa Rica, had been married three times (something Thomas did not know when he married her), and that she lied and used sex to manipulate men into marrying her.

Thomas stated that Prekoski also refused to call Thomas's grandmother as a witness, even though she was home when Thomas was there with stepson and could testify about whether she had seen stepson leaving the bedroom or acting strangely. Thomas questioned why Prekoski was excluding these key witnesses and did not care to "get the truth out" and avert an unfair trial and life sentence. Thomas stated that Prekoski's angry demeanor had traumatized him. Thomas felt that he could not trust Prekoski because of the breakdown in communication, conflict of interest (based on Prekoski having been assigned to the case only because he did not know Elizabeth T. and David G.), wasted time, inadequate preparation for motions and trial, and Prekoski's anger and bias against him. Thomas reiterated his preference to represent himself rather than to go to trial with Prekoski as his counsel.

Thomas told the trial court that he would not be ready to start the trial that day, as scheduled, if the court allowed him to represent himself.

Prekoski preferred to limit his response to any questions the trial court had, due to Thomas's belief that it was Prekoski's advocacy at the prior *Marsden* hearings that had

30

kept those from being granted. In response to the court's questions, Prekoski stated that he had told Thomas that he had more experience than O'Keefe, which he did. He reported that he had handled approximately 50 sex offense cases and had taken five or six of those to trial. Regarding showing Thomas the children's statements, Prekoski admitted his attempts to play the videos for Thomas in jail had failed but he had prepared transcripts for Thomas to review.

As to Thomas's allegation that he rejected key witnesses and refused to investigate bias of his accusers, Prekoski described his communications with a "Mr. Goodyear" who had contacted him six days earlier. Goodyear made a series of hearsay allegations against stepson's mother, Catalina F., including that of the murder in Costa Rica and that she had similarly accused her prior ex-husband, a "Curt [W.]." The defense found information that Curt W. might have been residing in South Carolina but did not know if that was true. Goodyear refused to connect Prekoski with Curt W. and indicated that Curt W. did not want to participate in any way. Goodyear then showed up at the court, where Prekoski spoke with him again "more thoroughly" and took notes. Prekoski explained that although he had "some concern" about both Thomas's mother and grandmother as witnesses, he decided "as a tactical proposition" to go with "the 69-year-old mother as opposed to the 91- or 92-year-old grandmother."

Prekoski also stated that he believed the defense strategy was not about bias of the witnesses. There was a defense based on Thomas's consistent denial of wrongdoing and the absence of physical evidence. Prekoski had discussed his concerns about how the jurors might "stack up" the evidence and whether they should resolve the case; he tried to express to Thomas that regardless of his "thoughts and theories about what may have gone on behind the scenes" there was little "beyond speculation" to support his conclusions. Prekoski stated that his courtroom advocacy at trial would not include any of the skepticism he had expressed or his concerns about the case. He would argue "the

31

lack of physical evidence and very young, impressionable victims essentially making statements in a vacuum."

Prekoski acknowledged that communication with Thomas was "very, very challenging" and that he had probably raised his voice during their discussions. He agreed that he and Thomas often ended meetings feeling as though they have not accomplished what either wanted to achieve. Prekoski was not certain whether their challenged communication "constitute[d] a breakdown" and noted that sometimes they were "inefficient," they "wasted time," and "spent hours together accomplishing very little." Prekoski believed that Thomas was competent, understood the charges against him, and was present when they were discussing the case.

The trial court asked what effect the difficulties with communication might have on the trial. Prekoski stated that he was prepared for the People's case, though he did not believe the defense was prepared for Thomas to testify on his own behalf. The court noted that the People's case was expected to take two weeks and there was still time for the defense to prepare Thomas, should he choose to testify. The court asked whether the communication difficulties would prevent Prekoski from preparing Thomas for his testimony. Prekoski responded, "[i]t has so far." He explained that their communication up until that point had made it "almost impossible" to prepare Thomas for his direct examination. Prekoski explained that Thomas believed he was "incapable of performing the task at hand" and put no stock in his advice, leading them to "spend hours on end debating" his failures and lack of advocacy.

Thomas responded that he had never heard Prekoski describe a strategy for the defense before the *Marsden* hearing. He believed Prekoski lied and simply tailored a response based on Thomas's complaints and the court's questions. Thomas clarified that his point about Prekoski not taking his proposed witnesses seriously was not about the murder allegation, since "obviously there is no record of [Catalina F.] murdering someone in Costa Rica," but about showing her "method of operation . . . that she's

32

habitually doing this to men . . . [a]nd when she doesn't get what she wants, she discards them and alleges things against them." Thomas did not understand how what he said and knew to be true based on his own life could be a "paranoid rant" like Prekoski made it out to be.

The trial court denied the third *Marsden* motion, stating there was "no doubt that the Defense Counsel has adequately represented the defendant." The court stated that it had carefully considered whether Thomas and his counsel were embroiled in an irreconcilable conflict. It found the failure in communication was due to Thomas's "recalcitrant attitude and his focus on matters that are not relevant or admissible at trial . . . ." The court believed that Prekoski's lack of familiarity with individuals at the district attorney's office "should have taken care of" Thomas's concern about a potential conflict, but it had not. The court observed that defense counsel had been "working hard and skillfully," and though the defendant was unhappy with Prekoski's tactical decisions, it was "the job of any attorney worth . . . his or her salt . . . to tell and shoot straight with the client about [their] likelihood of success, why certain evidence is not admissible, and . . . not . . . worth spending . . . any time on."

The trial court pointed out that defense attorneys typically do not focus on one type of case, and that Prekoski had handled 50 sex cases and taken five to trial. It found that Thomas was "a smart man" and had "competent counsel that you can listen to, listen to the advice, and if you communicate with him, as I expect you to, you will have very effective assistance of counsel . . . ."

#### d. Faretta *Motion*

The trial court reconvened to discuss Thomas's *Faretta* request with the deputy district attorney present. It explained that Thomas had "raised a *Faretta* issue" during the *Marsden* motion, and that the court intended to deny the request as untimely based on "a lot of factors."

33

The trial court noted that the case had been continued several times already. This was the morning of the trial, and Thomas had said he was not ready to proceed if the *Faretta* request were granted. The children, as minors, had priority in trials; yet there would be a significant delay required for Thomas to prepare for his trial. The court also noted that the defense counsel was prepared to try the case and had demonstrated his competence and preparation to do so.

The deputy district attorney added that the case was over two years old. There were already three continuances granted for the defense, and both parties were present for the trial date that day. The deputy district attorney argued that this appeared to be a delay tactic or a means to another continuance, given that there was no reference to any *Faretta* issue in their prior court dates, including two dates the week before.

Thomas explained that he did not make a *Faretta* request at the first *Marsden* hearing because he did not really want to do it and "would rather have an attorney that has 400 plus trials under their belt." He did not make the request with the second *Marsden* because he was so "out of [his] mind frustrated" with the public defender's office and his attorney for going forward with the recusal motion before a different judge that he "did the *Marsden* spur of the moment" because he saw that the motion was not handled properly. He did not ask to represent himself when the *Marsden* was denied because he was still trying for an alternate public defender or for O'Keefe to be substituted back in. He confirmed, "[t]hat's what I want. That's what I need. I feel that that's what's best for me."

The trial court denied the *Faretta* request for the reasons it had stated, noting that Thomas had the right to retain any counsel he wanted but it was now the morning of the trial and jury selection was under way.

### *2. The Trial Court Did Not Abuse its Discretion in Denying the* **Marsden** *Motions*

A criminal defendant is entitled under the Sixth Amendment right to assistance of counsel to substitute another appointed attorney " ' " ' "if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' " ' " (*People v. Valdez* (2004) 32 Cal.4th 73, 95 (*Valdez*).) A defendant who seeks to substitute court-appointed counsel on the basis of inadequate representation must be permitted to explain the basis of his or her contention and to relate specific instances of inadequate performance. (*People v. Rodriguez* (2014) 58 Cal.4th 587, 623 (*Rodriguez*); see *Marsden*, *supra*, 2 Cal.3d at p. 123.) "If the court holds an adequate hearing, its ruling is reviewed for abuse of discretion." (*Rodriguez*, *supra*, at p. 623.)

" 'A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense.' " (*Valdez*, *supra*, 32 Cal.4th at p. 95.) The denial of a *Marsden* motion is therefore " ' "not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would 'substantially impair' the defendant's right to assistance of counsel." ' " (*Ibid*.) " 'Tactical disagreements between the defendant and his attorney do not by themselves constitute an "irreconcilable conflict." ' " (*Ibid*.) Nor does a defendant's "claimed lack of trust in, or inability to get along with, an appointed attorney" compel, without more, the discharge of appointed counsel. (*People v. Crandell* (1988) 46 Cal.3d 833, 860 (*Crandell*), abrogated on another ground by *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.) "A trial court is not required to conclude that an *irreconcilable* conflict exists if the defendant has not made a sustained good faith effort to work out any disagreements with counsel and has not given counsel a fair opportunity to demonstrate trustworthiness." (*Crandell*, *supra*, at p. 860.)

Applying these principles, we find that Thomas has not shown the trial court abused its discretion in refusing his requests to discharge Prekoski and substitute counsel from the alternate defender's office.

Two themes dominated Thomas's *Marsden* motions. One was the persistent disagreement between Thomas and Prekoski over the strategy in his case. Thomas points out that by the third *Marsden* hearing (which took place on the morning of jury selection), Prekoski had grown so weary of the relationship that he characterized Thomas's preferred defense as an "essentially foundationless paranoid rant[] about a conspiracy between the parents of the accusing witnesses in the case." The second theme was the effective breakdown of communications, which led Prekoski to state at the third *Marsden* hearing that he had not yet prepared Thomas for his direct examination, because communicating with Thomas by that point was "almost impossible . . . ."

Thomas contends there is no serious dispute that there was an irreconcilable conflict between him and his counsel, given the severe communication breakdown and his counsel's refusal to pursue a defense strategy that would have offered a coherent theory for why Thomas was the subject of false or inflated accusations. He asserts that any determination of error in denial of the *Marsden* motions thus turns on (1) who was legally responsible for the breakdown in communications, and (2) whether Prekoski's continued representation denied Thomas's right to effective assistance of counsel at trial.

We disagree with the premise that there was an irreconcilable conflict, as that term is understood in the context of a *Marsden* request. As Thomas acknowledges, a disagreement about tactics is insufficient to compel the discharge of appointed counsel, unless it signals a complete breakdown in the attorney-client relationship. (*Crandell*, *supra*, 46 Cal.3d at pp. 859-860.) While Thomas may have perceived that the tactical disagreements, strained communication, and mutual distrust and frustration between him and his counsel signified a total breakdown in the relationship, there were several factors

that the trial court considered, which reasonably supported its conclusion that the failings in the attorney-client relationship did not warrant Prekoski's removal.

First, the "essential aim [of the constitutional right to assistance of counsel] 'is to guarantee "an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." ' " (*People v. Sapp* (2003) 31 Cal.4th 240, 256; accord *People v. Cole* (2004) 33 Cal.4th 1158, 1184.) The trial court properly focused its analysis on the competency of Prekoski's representation, not on Thomas's desire to be represented by his former deputy public defender, O'Keefe, or by the alternate defender's office.

Second, Thomas's primary tactical disagreement with his counsel centered on his desired witnesses and defense strategy. Thomas insisted that Prekoski refused to consider or take seriously his proposed witnesses and believed his evidence was "worthless." In the context of the *Marsden* hearings, however, the record fails to establish that Prekoski's investigation into and consideration of Thomas's desired defense strategy was inadequate. To the contrary, the record shows that the defense investigator interviewed all potential witnesses identified by Thomas, and Prekoski reasonably decided that some, but not all, of those individuals would assist the defense's case at trial. Prekoski followed up several times with Goodyear, the friend of defendant's mother who claimed to have proof of Catalina F.'s alleged pattern of treatment of her ex-husbands. Prekoski found the hearsay information supplied by Goodyear insufficient to substantiate the allegations against Catalina F. and learned that the ex-husband who purportedly had firsthand knowledge of Catalina F.'s pattern of false accusations would not speak with or assist the defense. The trial court was entitled to accept Prekoski's reasoned explanation, notwithstanding Thomas's view that his counsel's responses were contrived to appease the court. (*People v. Clark* (2011) 52 Cal.4th 856, 912 (*Clark*); *People v. Abilez* (2007) 41 Cal.4th 472, 488 [" ' "[t]o the extent there was a credibility question between

37

defendant and counsel at the hearing, the court was 'entitled to accept counsel's explanation' " ' "].)

The record of the *Marsden* hearings also shows that Prekoski had sound strategic reasons for rejecting Thomas's requested defense theory. Judge Hayes and Judge Liu separately credited Prekoski's assessment of Thomas's desired approach, which he believed suffered legal relevance and admissibility problems and risked alienating jurors. On appeal, however, Thomas contends that there were legitimate grounds for the conspiracy-centered defense, which would have shown that the allegations against him were false and/or embellished to accomplish Elizabeth T.'s stated goal of ending his parental rights to daughter. He asserts, without support from the record, that there was a "documented pattern of communications" between Aimee T., Catalina F., and Elizabeth T., which supported his belief that they had conspired with the district attorney's office to increase the strength of the case and severity of charges against him. We find that the claimed evidentiary support for Thomas's desired defense strategy is not apparent from the record of the *Marsden* hearings.[5] But even assuming that something more than speculative support for this theory had been shown at the *Marsden* hearings, a defendant's right of representation does not encompass unfettered decision making authority over his defense. (*Rodriguez*, *supra*, 58 Cal.4th at p. 624 [explaining that a defendant's choice to be represented by professional counsel means " ' "counsel is 'captain of the ship' and can make all but a few fundamental decisions for the defendant" ' "].)

Third, the record from each of the *Marsden* hearings supports the trial court's determination that the communication difficulties between Thomas and Prekoski

---

[5] The question of whether Prekoski failed to pursue Thomas's desired defense based on the purported conspiracy between maternal grandparents, Thomas's ex-wives, and the district attorney's office is closely tied to the conflict of interest issue. We examine the allegations and evidence related to that issue in detail *post* (part II.B.), in our discussion of the failed motion to recuse the Monterey County District Attorney's Office.

predominantly resulted from Thomas's distrust of Prekoski and lack of faith in his legal counsel and qualifications. Thomas stated at the outset of the first *Marsden* hearing that he was surprised and upset by Prekoski's unannounced replacement of O'Keefe and that he did not trust Prekoski and would not go to trial with him. At the second *Marsden* hearing, Thomas accused Prekoski of lying about his case strategy and his reasons for refusing to bring the motions that Thomas requested. And at the third *Marsden* hearing, Thomas again accused Prekoski of lying about issues ranging from his experience handling sex offense cases to his supposed repudiation of witnesses and information that could help the defense's case. Although Thomas insisted that he had tried to maintain a good working dialogue as directed by the trial court, the tenor of his complaints in the subsequent hearings displayed what Judge Hayes deemed a "recalcitrant attitude" with continued "focus on matters that [were] not relevant or admissible at trial . . . ."

Prekoski, moreover, confirmed that he was struggling to work effectively with Thomas and admitted they were inefficient and wasted "hours" at times debating his inadequacies. Prekoski also admitted his frustration and losses of composure and acknowledged that the communication problems had thus far interfered with his ability to prepare Thomas for his direct examination. Under these circumstances, the trial court could reasonably conclude, as it did, that Thomas's distrust in Prekoski was misplaced, and that he had "competent counsel" who could provide "very effective assistance" provided that Thomas would listen and communicate with him.

Thomas gains little by suggesting that he had a close working relationship with his former deputy public defender, O'Keefe, because O'Keefe was more receptive to Thomas's desired defense. The relevant inquiry, which the trial court ably undertook in careful detail, pertained solely to Thomas's specific complaints about Prekoski and whether they stated grounds for his discharge. (*Valdez*, *supra*, 32 Cal.4th at p. 95.) Thomas fails to demonstrate that the trial court's conclusion about Thomas's role in the communication breakdown was erroneous or irrational. "A trial court is not required to

39

conclude that an *irreconcilable* conflict exists if the defendant has not made a sustained good faith effort to work out any disagreements with counsel and has not given counsel a fair opportunity to demonstrate trustworthiness." (*Crandell*, *supra*, 46 Cal.3d at p. 860; accord *People v. Jones* (2003) 29 Cal.4th 1229, 1246 ["If a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law."].)

In sum, the fact that a defendant distrusts his or her court appointed attorney and disagrees with their tactics may not signify an irreconcilable conflict, particularly where the reasons for the breakdown rest mainly with the defendant. The California Supreme Court's decision in the death penalty case of *Clark*, *supra*, 52 Cal.4th 856, illustrates this point. The defendant brought a series of *Marsden* motions seeking to discharge his deputy public defenders and asking for the appointment of independent counsel. (*Id*. at pp. 909, 911.) Among the issues the defendant asserted, he believed that his counsel "would not fight for him because she had urged him to plea bargain for a sentence of life without the possibility of parole, . . . and that she disapproved of his plea of not guilty by reason of insanity." (*Id*. at p. 912.) He also asserted that he could not communicate with his counsel because he no longer trusted her; he argued that she had admitted an irreconcilable conflict when she placed responsibility for the communication breakdown on his "mental problems involving women, specifically, his feelings of paranoia and distrust . . . ." (*Id*. at p. 913.)

The high court found no abuse of discretion in the trial court's denial of the *Marsden* motions, noting that tactical disagreements and distrust of counsel were not an adequate basis for substitution of counsel. (*Clark*, *supra*, 52 Cal.4th at p. 913.) The court explained that based on the record of the motions and the defendant's angry proclamations, the trial court reasonably could have found that the defendant had made

40

insufficient efforts to resolve his disagreements with counsel and that any breakdown in the relationship was attributable to his own refusal to cooperate. (*Ibid*.) It observed that the counsel's statements regarding the defendant's paranoia did not entitle him to new counsel, and that the trial court could reasonably conclude based on the record that the lapse in communication between the defendant and his counsel "was caused by unwelcome legal advice, not mental illness." (*Id*. at p. 914.)

Here, like in *Clark*, there was an undeniable rift between Thomas and his counsel. But this largely seemed to be the result of "unwelcome legal advice" (*Clark*, *supra*, 52 Cal.4th at p. 914) which Thomas interpreted as a sign that Prekoski would not fight for him and did not take his position seriously. Although Prekoski's rejection of Thomas's desired defense strategy to assert a conspiracy between the district attorney's office and the families of the accusing victims created a disagreement with his client, it was his duty and prerogative to pursue the strategy that he believed would be legally permissible and most effective at trial. (See *People v. Michaels* (2002) 28 Cal.4th 486, 523 [affirming denial of *Marsden* motion where the defendant's principal objection to his counsel "was managing the defense as a lead attorney should do, rather than deferring to [the] defendant's opinions"].) The trial court could have reasonably concluded that Thomas's distrust of his counsel and disagreement with his legal advice grew out of certain misconceptions about his right to select preferred counsel and to control the defense, and that Prekoski had provided skillful representation and would continue to do so at trial with the benefit of Thomas's cooperation. (*People v. Michaels*, *supra*, 28 Cal.4th at p. 523 [explaining that while the conflict with counsel could imperil effective representation, there was nothing in the record showing that counsel "would not provide adequate representation if he received defendant's cooperation"].)

Put simply, the record does not support the notion—articulated most directly in Thomas's reply brief on appeal—that his *Marsden* requests should have been granted because his counsel was effectively denying him a fair defense. His claim that there was

41

"no realistic and effective way to challenge the testimony [of daughter and stepson] other than to argue that their testimony was unreliable because the children were being influenced by [maternal] grandmother and [Thomas's] estranged wives to falsely accuse [Thomas]" is not tied to anything in the record of the *Marsden* motions demonstrating how such a defense would have been legally plausible, and thus why Prekoski's rejection of it jeopardized Thomas's constitutional right to the assistance of counsel.[6] Accordingly, we conclude that Thomas has failed to show the trial court abused its discretion in denying each of the *Marsden* motions and has not demonstrated that the conflict with Prekoski jeopardized his constitutional right to the assistance of counsel.

### 3.  *The Trial Court Did Not Abuse Its Discretion in Denying the* Faretta *Motion*

A criminal defendant may waive his constitutional right to counsel and represent himself at trial.  (*Faretta*, *supra*, 422 U.S. at pp. 834-835.)  "The right of self-representation is absolute, but only if a request to do so is knowingly and voluntarily made and if asserted a reasonable time before trial begins.  Otherwise, requests for self-representation are addressed to the trial court's sound discretion."  (*People v. Doolin* (2009) 45 Cal.4th 390, 453, citing *People v. Windham* (1977) 19 Cal.3d 121, 127-129 (*Windham*); see also *People v. Bradford* (2010) 187 Cal.App.4th 1345, 1353 (*Bradford*).) " 'When a motion for self-representation is not made in a timely fashion prior to trial,

---

[6] What is more, the argument advanced in the reply brief improperly relies on a decision of the Ninth Circuit Court of Appeals that was vacated when the case was taken en banc.  (See *Plumlee v. Del Papa* (9th Cir. 2006) 465 F.3d 910, rehearing granted and opn. vacated by *Plumlee v. Masto* (9th Cir. Nev., 2007) 497 F.3d 981, 2007 U.S. App. LEXIS 19002.)  The en banc court reached the opposite result and denied the defendant's writ of habeas corpus, stating that the Nevada Supreme Court "did not misapply clearly established federal law as determined by the Supreme Court when it ruled that [the defendant]'s right to the effective assistance of counsel was not violated by the trial judge's refusal to appoint a different lawyer."  (*Plumlee v. Masto* (9th Cir. 2008) 512 F.3d 1204, 1206.)

self-representation no longer is a matter of right but is subject to the trial court's discretion.' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 959.)

There is no rigid formula for assessing timeliness. (*People v. Lynch* (2010) 50 Cal.4th 693, 722-724 (*Lynch*), abrogated on another ground by *People v. McKinnon* (2011) 52 Cal.4th 610.) Though the California Supreme Court has not "fixed any definitive time before trial at which a motion for self-representation is considered untimely" (*Lynch*, *supra*, at p. 722), it has "held on numerous occasions that *Faretta* motions made on the eve of trial are untimely" (*ibid.*). A trial court thus has discretion to deny a motion for self-representation made within days of the commencement of trial. (*People v. Howze* (2001) 85 Cal.App.4th 1380, 1397 (*Howze*).)

In exercising its discretion, a trial court may consider factors such as "the defendant's reasons for the motion, the quality of defense counsel's representation, the defendant's proclivity to substitute counsel, the length and stage of the proceedings, and the disruption or delay that might reasonably be expected to follow if the motion were granted." (*Bradford*, *supra*, 187 Cal.App.4th at p. 1353, citing *Windham*, *supra*, 19 Cal.3d at pp. 127-129; accord *People v. Jenkins*, *supra*, 22 Cal.4th at p. 959.) On appeal, the reviewing court "must give 'considerable weight' to the [trial] court's exercise of discretion and must examine the total circumstances confronting the court when the decision is made." (*Howze*, *supra*, 85 Cal.App.4th at pp. 1397-1398.)

Thomas in this case recognizes that his *Faretta* motion was made after the commencement of trial while prospective jurors were waiting for voir dire, impliedly conceding that the trial court had discretion to deny the motion as untimely. He contends, however, that applying the factors articulated in *Windham*, *supra*, 19 Cal.3d at pages 127 through 129, the trial court should have granted his request for self-representation. Thomas points out that he did not attempt to substitute counsel before Prekoski's appointment. He argues that his delayed request for self-representation must be viewed in the context of the revolving door of deputy public defenders that he

43

experienced, through no fault of his own, as well as the deterioration of the attorney-client relationship to the point where he expressed feeling traumatized by his counsel's treatment of him. Although circumstances would have required some delay in proceedings to prepare for trial, Thomas submits that his constitutional rights to due process and a fair trial outweighed whatever minor setback would have resulted, particularly because the record does not reflect an attempt to delay for the sake of delay.

Our Supreme Court has made clear that the "imposition of a timeliness 'requirement should not be and, indeed, must not be used as a means of limiting a defendant's *constitutional* right of self-representation.' " (*Lynch*, *supra*, 50 Cal.4th at p. 722.) But it is also true that Thomas's *Faretta* motion must be viewed in context of the totality of the circumstances. (*Id.* at p. 726; *Howze*, *supra*, 85 Cal.App.4th at pp. 1397-1398.) Because Thomas did not unequivocally assert his right to self-representation within a reasonable time prior to the commencement of trial (*Lynch*, *supra*, at p. 726), the matter was properly left to the trial court's discretion. (*People v. Jenkins*, *supra*, 22 Cal.4th at p. 959.)

Nothing in the record suggests that the trial court erred in weighing the relevant factors. Given that Thomas sought self-representation only as a backstop for his attempts to substitute counsel, due to his discontent with Prekoski, the trial court properly reflected on the ability and readiness of counsel, stating that defense counsel had demonstrated he was competent and prepared to try the case for Thomas. The trial court also considered the stage of the proceedings and gave Thomas a chance to discuss whether he would be prepared to start the trial or would require time to prepare. It reasoned that the case was an "older case" that had already been subject to delays, that the children were now six and 12, and that there would be "a significant delay" if the motion were granted. The court also agreed with the prosecution's point that having failed to raise the issue at either of the two court dates in the week prior, Thomas's request on the morning of jury selection appeared to be a further effort to delay the trial. Assigning the trial court's

assessment of these factors " 'considerable weight' " (*Howze*, *supra*, 85 Cal.App.4th at p. 1397), we conclude that the court did not abuse its discretion in denying the motion on the grounds properly considered.

### B. DENIAL OF MOTION TO RECUSE THE DISTRICT ATTORNEY'S OFFICE

Thomas contends that the trial court's denial of his motion to recuse the Monterey County District Attorney's office pursuant to section 1424 without conducting an evidentiary hearing was an abuse of discretion and violated his due process rights under the Fourteenth Amendment of the United States Constitution.

#### 1. *Relevant Background and Procedural History*

Defense counsel filed a motion to recuse the district attorney's office on July 20, 2016 (shortly before Thomas's second *Marden* request). The motion to recuse was premised on a conflict of interest in the prosecutor's office due to the personal involvement in the case of daughter's maternal grandparents, each of whom held or had held positions in that office.

According to the motion, daughter disclosed Thomas's alleged conduct to Aimee T. on March 31, 2014. Aimee T. immediately consulted with Elizabeth T. because she was a retired Monterey County prosecutor. When David G. returned home, Aimee T. and Elizabeth T. " 'discussed the situation' " with him and determined that since he was a deputy district attorney for the county, he would contact his supervisor. At the supervisor's direction, they contacted the Pacific Grove Police Department. Elizabeth T. and David G. were interviewed by officers as part of the investigation. Defense counsel emphasized that it was unknown what role Elizabeth T. and David G. had played behind the scenes and within the Monterey County district attorney's office since 2014. In an attached declaration, Prekoski stated that since his assignment to the case, the district attorney had taken the position that the deadline for settlement negotiations had passed and "any subsequent offers to settle the case must be 'not less

45

than' " 20 years. Thomas declared in an additional, attached declaration that Elizabeth T. had said she would do "everything in her power to ensure" he had no contact with daughter, and that he believed this "to include manipulating the judicial process in favor of the prosecution."

Defense counsel claimed that because Elizabeth T. and David G. might be called to testify at trial, the assigned Monterey County prosecutor would be forced to examine them and effectively vouch for their credibility as employees of the agency. Defense counsel argued that this created a conflict of interest within the meaning of the Penal Code provision that provides for recusal of a district attorney's office when "a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (§ 1424, subd. (a)(1).) In support, defense counsel cited case authority stating that a conflict exists when there is a reasonable probability that a prosecutor's office may not exercise its discretion fairly, and furthermore that no showing of actual conflict is required, only the appearance of conflict. The defense argued that courts had upheld the recusal of an entire district attorney's office where intense emotional involvement in the case on the part of one or more employees of the office makes a fair and impartial prosecution unlikely.

The Attorney General's office opposed the recusal motion. The People argued that there was no basis for recusal, because neither Elizabeth T. nor David G. would be called as witnesses, and the assigned deputy district attorney, Sulaiman Tokhi, was a recent hire who did not know Elizabeth T. or David G., had been walled off from David G. during the course of the prosecution, and had spoken to maternal grandparents only "to inform them of scheduling." The People asserted that Thomas's recusal motion incorrectly relied on the defunct standard of *appearance of impropriety* rather than on the applicable law, which required Thomas to demonstrate a grave conflict showing an actual likelihood of unfair treatment. As Thomas sought to recuse the entire district attorney's office, the People argued that his burden was especially high. The People also claimed

46

that Thomas was not entitled to an evidentiary hearing under the statute and case authority, since the affidavits provided a sufficient basis for the trial court to decide the issue.

In an attached declaration, Tokhi stated that he was assigned the case immediately upon joining the Monterey County district attorney's office in September 2014, about one month after the case was first filed. Tokhi confirmed that daughter is the granddaughter of former deputy district attorney Elizabeth T. and step granddaughter of deputy district attorney David G. Tokhi understood that David G. "was to be walled off from prosecution of the case" and believed "that [wa]s exactly" what had been happening. Tokhi stated that he and David G. did not work in the same building or prosecutorial unit and were not in a supervisorial relationship. He declared that his "only contacts" with David G. regarding the case related to "calendaring updates and case updates." He attested that these interactions did not affect his prosecution of the case. Tokhi also described his limited contact with Elizabeth T. on one occasion, when he provided her and the victim's advocate a case update on the court's ruling on a motion for closed-circuit testimony involving daughter. Tokhi declared that neither David G. nor Elizabeth T. were listed on the updated witness list. The People did not intend to call them at trial since daughter's initial disclosure was to Aimee T.

Tokhi also attested more broadly about the case timeline and management. He declared that the district attorney's office initially rejected the charges associated with daughter in April 2014; it was only after stepson's disclosure that charges were filed. Those charges, pertaining to stepson, were more numerous and carried greater penalties than those pertaining to daughter. He also declared that his office had never imposed a deadline on settlement negotiations or expressed an unwillingness to entertain reasonable offers. The offer to resolve the case for 20 years had been a pre-preliminary hearing offer, which was rejected at the time by Thomas's private defense attorney and later rejected again by deputy public defender O'Keefe. Tokhi lastly declared that the trial

date had been continued three times already due to defense counsel turnover and continuance requests.

Judge Liu heard the recusal motion on August 2, 2016. Defense counsel stated that having not anticipated Judge Hayes's absence that day, the defense was concerned that the motion to recuse could not be properly entertained by a different judge. Defense counsel expressed Thomas's belief that the influence exercised by Elizabeth T. and David G. over the prosecution of the case might not be limited to the assigned deputy district attorney or even the entire district attorney's office, and thus "whether . . . Judge Hayes or any person . . . on his professional staff ha[d] felt those pressures could only be answered by Judge Hayes." He explained Thomas's concern that in order for Judge Hayes to preside over the jury trial, he needed to hear the recusal motion and assimilate any further facts to be adduced in an evidentiary hearing about the conflict of interest.

The trial court overruled the defense request to defer ruling on the motion until it could be heard by Judge Hayes.[7] Judge Liu observed that given the defense's concern about potential influence over the court system, it would be preferable to have a judge other than the trial judge consider the issue. The court also noted that to the extent Thomas wished to challenge the relationship between the prosecutor's office and the court system or court personnel, that was not an issue that required a hearing specifically before Judge Hayes.

On the merits of the recusal motion, defense counsel stated that he understood after receiving the People's witness list that the prosecution did not intend to call Elizabeth T. or David G. during their case-in-chief. However, he urged the trial court to consider the potential that they might be called as rebuttal witnesses. Defense counsel

---

[7] After the trial court overruled the defense's objection to Judge Liu presiding over the motion for recusal, Thomas made his second *Marsden* request. The hearing on the merits of the recusal motion continued after the trial court denied the *Marsden* motion in a closed hearing, discussed *ante* (part II.A.1.b.).

challenged the prosecutor's representations about settlement discussions, noting that after a certain point in negotiations (prior to Prekoski's assignment to the case), the prosecution had applied "arbitrary conditions, particularly with regard to the term of years" to any resolution offer. Finally, defense counsel emphasized the question of potential influence that Elizabeth T. and David G. might have wielded over daughter and/or the prosecution, especially given their access to daughter, who lived with them.

On the question of an evidentiary hearing, defense counsel acknowledged the People's position and asked that Thomas be permitted to "amplify" his declaration to clarify its meaning. Defense counsel suggested this would not require an evidentiary hearing in the typical sense. He stated that Thomas believed that Elizabeth's statement— set forth in paragraph four of Thomas's declaration—meant she would do everything in her power to take daughter from him, including using her power as a deputized district attorney. Counsel for the attorney general's office did not object to the "amplification" of Thomas's declaration, and the trial court agreed to consider the clarification which it noted did not present a particularly material change from the declaration as filed.

In response to the motion, counsel for the attorney general's office disputed any unfairness or suggestion of bias in the handling of settlement negotiations by the district attorney's office. She pointed out that the People are not required to offer a plea deal, and in this case the trial prosecutor (Tokhi) acted fairly by extending the same offer of 20 years to then-appointed counsel (O'Keefe) as he had offered before the preliminary hearing to Thomas's retained counsel.

Counsel for the Attorney General characterized the defense's other points as purely speculative. She pointed out that the defense gave no factual basis to support the notion that if Thomas were to testify, it might elicit rebuttal testimony by Elizabeth T. or David G. She argued the same was true for the claim that maternal grandparents were wielding influence over the prosecution of the case. She submitted there was no such evidence in this case, where the district attorney's office erected an ethical wall and

49

selected a newly-hired attorney for the case who did not know either maternal grandmother or grandfather. She also challenged the notion of familial influence as contrary to the case's procedural history, given the fact that despite family ties with the prosecutor's office, the disclosure of sexual abuse by daughter did not immediately result in charges against Thomas. Only when stepson independently disclosed abuse, and the case became more serious, did the office file charges.

Defense counsel cautioned against dismissing the potential for influence held by Elizabeth T. and David G. He pointed out that their initial involvement in deciding whom to call and how to proceed after daughter's disclosure was not disputed. Defense counsel argued that while the defense could not pretend to know whether or to what extent maternal grandparents were involved in discussions about how the case should be charged, the potential for influence was "troubling."

The trial court denied the recusal motion. It found that based upon the affidavits, an evidentiary hearing was not necessary since "the facts needed to decide the motion are all contained within the affidavits." The court then considered each of the cited bases for recusal. The court found nothing problematic in the settlement negotiations, noting the offer of 20 years did not "evidence any bias" in the court's mind, and that neither a higher nor a lower offer would have shocked the court. It found that while there was "conceivably potential" for Elizabeth T. or David G. to exert influence, there was "simply no evidence of it." The court contrasted the speculative nature of the influence argument against the evidence provided by the prosecuting attorney's declaration—which the court "credit[ed] . . . in full"—of appropriate efforts taken to wall off Tokhi from David G. or from any potential influence. The court concluded that having found no evidence of improper influence, it was unlikely that such influence (if it were to exist) would be grave enough to render it unlikely that Thomas would receive fair treatment throughout the criminal proceedings.

## 2. *The Trial Court Did Not Err in Denying the Recusal Motion Without Holding an Evidentiary Hearing*

Section 1424 governs disqualification of a district attorney from performing an authorized duty. A motion pursuant to this section to recuse the district attorney's office "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (§ 1424, subd. (a)(1); *People v. Bell* (2019) 7 Cal.5th 70, 97 (*Bell*).) It is the defendant's burden to state the grounds for the claimed disqualification "supported by affidavits of witnesses who are competent to testify to the facts set forth in the affidavit." (§ 1424, subd. (a)(1).) The trial judge reviews the affidavits submitted in support of and in opposition to the motion and determines "whether . . . an evidentiary hearing is necessary." (*Ibid*.)

In considering the merits of the motion, courts apply a two-part test under the statute to determine (1) " ' "is there a conflict of interest," ' " and (2) " ' "is the conflict so severe as to disqualify the district attorney from acting?" ' " (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711 (*Haraguchi*).) A "conflict" exists, within the meaning of section 1424, " 'whenever the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner.' " (*Packer v. Superior Court* (2014) 60 Cal.4th 695, 709 (*Packer*); accord *Bell*, *supra*, 7 Cal.5th at p. 97.) "But recusal is not required unless, under the second prong, the possibility of unfair treatment 'is so great that it is more likely than not the defendant will be treated unfairly during some portion of the criminal proceedings.' " (*Bell*, *supra*, at p. 97, quoting *Haraguchi*, *supra*, at p. 713.)

We review the trial court's decision on a motion to recuse for abuse of discretion (*Bell*, *supra*, 7 Cal.5th at p. 97), including the determination whether to hold an evidentiary hearing (*Packer*, *supra*, 60 Cal.4th at p. 710). The abuse of discretion standard applies as follows: "[t]he trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of

51

the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi*, *supra*, 43 Cal.4th at pp. 711-712.)

The circumstances presented and applicable principles of law do not vindicate Thomas's claims of error.

Thomas principally contends that the trial court abused its discretion in deciding that there was no need for an evidentiary hearing. He argues that there was an undisputed conflict of interest, given daughter's familial relationships with a former and a current member of the district attorney's office, and that the trial court's ruling failed to properly consider the People's affidavits which established that Elizabeth T. and David G. worked with David G.'s superior to plan the steps taken after daughter's disclosure. Thomas points out that after this initial involvement, and despite the supposed ethical wall, there were ongoing communications between maternal grandparents and the prosecutor. Thomas contends that Tokhi's admission of providing case updates to Elizabeth T. and David G. rendered the wall a "gimmick" and that Tokhi "without a doubt" understood that as a new prosecutor, his career prospects in the office depended on his successful prosecution of Thomas's case. Thomas submits that the trial court abused its discretion by refusing an evidentiary hearing, which was necessary to discover what transpired during the prosecutor's status reports to David G. and whether those interactions tainted the prosecution and made it unlikely that Thomas would have a fair trial.

We find that the trial court's decision not to hold an evidentiary hearing was not an abuse of discretion. As our Supreme Court explained in *Packer*, section 1424 establishes a two-stage process. (*Packer*, *supra*, 60 Cal.4th at p. 698.) In the first stage the trial court reviews the motion and affidavits submitted by both sides and exercises its discretion to determine whether the second stage, an evidentiary hearing, is necessary. (*Ibid*., citing § 1424, subd. (a)(1).) "An evidentiary hearing may be ordered if the defendant's affidavits establish a prima facie case for recusal—that is, if the defendant's affidavits, if *credited*, would require recusal." (*Packer*, *supra*, at p. 710.) Circumstances

that may require an evidentiary hearing include where the affidavits present "disputed material facts, the resolution of which may depend largely upon the affiants' veracity and credibility . . . ." (*Id*. at p. 698.) "[T]he Legislature intended that trial courts exercise broad discretion in deciding whether to hold evidentiary hearing under section 1424." (*Id*. at p. 711.)

In this case, the trial court reasonably ascertained that the material points of facts asserted in the affidavits were not contested. The facts most pertinent to the recusal motion were: (1) daughter and Aimee T. lived with maternal grandparents; (2) maternal grandparents were the first people to learn of daughter's disclosure aside from her mother; (3) maternal grandparents immediately contacted David G.'s supervisor at the district attorney's office, who directed them to contact the police; (4) Elizabeth T.'s stated intent was to do everything within her power to keep daughter from Thomas; (5) the prosecuting attorney was not amenable to discussing a negotiated disposition for less than the 20 years he had previously offered; (6) the prosecuting attorney communicated with David G., and once with Elizabeth T., to provide scheduling and case updates even though they were walled off from the case; and (7) Elizabeth T. and David G. could potentially be called to testify as rebuttal witnesses.

We find that even fully credited, the recited facts do not establish a prima facie case for recusal because they do not evidence a disabling conflict for the entire district attorney's office. Put differently, the trial court could have reasonably concluded that the facts alleged by the defense and the information provided by the prosecution were sufficient to describe a "conflict" for purposes of section 1424, because the circumstances presented a reasonable possibility that the district attorney's office might not have exercised its discretionary function evenhandedly. (*Packer*, *supra*, 60 Cal.4th at p. 710.) But it is not the "mere existence of a conflict" that determines recusal. (*Id*. at p. 709.) "Section 1424 does not authorize disqualification merely because the defense has shown that the prosecutor's involvement 'would be unseemly, would *appear* improper, or would

53

tend to reduce public confidence in the impartiality and integrity of the criminal justice system.' " (*Ibid*.; see also *People v. Gamache* (2010) 48 Cal.4th 347, 363 ["the possibility that a prosecutor might be influenced does not alone establish the requisite likelihood or probability that a defendant will be treated unfairly"].)

Instead, the conflict of interest must rise to a level that would require recusal. The defendant's burden pursuant to section 1424 is to allege facts which, if credited, establish *both* "(1) a 'conflict of interest,' and (2) that the conflict is 'so grave as to make a "fair trial" unlikely.' " (*Packer*, *supra*, 60 Cal.4th at p. 709.) This requires, at the second step of the inquiry, a showing that the conflict makes it "more likely than not the defendant will be treated unfairly during some portion of the criminal proceedings." (*Haraguchi*, *supra*, 43 Cal.4th at p. 713.) What is more, "[r]ecusal of an entire district attorney's office is an extreme step. The threshold necessary for recusing an entire office is higher than that for an individual prosecutor." (*People v. Cannedy* (2009) 176 Cal.App.4th 1474, 1481 (*Cannedy*); accord *People v. Trinh* (2014) 59 Cal.4th 216, 229 ["That burden is especially heavy where, as here, the defendant seeks to recuse not a single prosecutor but the entire office."].)

Here, a finder of fact could ascertain that maternal grandparents participated in or perhaps even precipitated Aimee T.'s decision to contact the police after daughter disclosed that " 'My daddy let's me touch here.' " But the district attorney's office did not file charges at that time, refuting an inference that the filing of charges was on account of the family's connection to the office or of Elizabeth T.'s personal vendetta to deprive Thomas of contact with daughter. It is also unsurprising that the trial court found nothing indicative of bias in the conduct of settlement negotiations, since the prosecuting attorney was not obligated to pursue a plea deal after his offer was rejected or to consider the defendant's proposed terms for resolving the case.

Nor was the uncertain prospect that one or both maternal grandparents would be called in rebuttal enough to establish so grave a conflict as to mandate recusal.

Numerous cases have addressed the pressures on prosecutorial discretion in this scenario and have largely rejected the contention that recusal of an entire district attorney's office is warranted, even where the victim or other percipient witnesses are employees of the office. (See, e.g., *People v. Gamache*, *supra*, 48 Cal.4th at pp. 361-366 [denying recusal of office where surviving victim and key trial witness in capital murder case had been employed in the district attorney's office as a typist for 10 years and was married to the murder victim]; *Cannedy*, *supra*, 176 Cal.App.4th at pp. 1484-1491 [denying recusal where one or more staff employees of the district attorney's office were potential trial witnesses in false imprisonment and attempted sexual battery case].)

In our view, the most compelling fact to support Thomas's belief that maternal grandparents held influence with the district attorney's office was one that received scant attention at the hearing on the motion to recuse. Tokhi's affidavit stated that his contact with David G. was limited to "calendaring updates and case updates" but that these interactions did not affect his prosecution of the case. Such contact, however limited, is inconsistent with the representation that the district attorney's office had established an ethical wall. The fact that Tokhi communicated with David G. to provide case or schedule updates invites speculation of impropriety and could " 'tend to reduce public confidence in the impartiality and integrity of the criminal justice system.' " (*Packer*, *supra*, 60 Cal.4th at p. 709.) The trial court accurately observed that it was "conceivably" possible that some undue interference had occurred.

But this apparent impropriety does not lead to the inexorable conclusion that an evidentiary hearing was necessary under section 1424 because, without more, the unseemly contact fails to amount to a prima facie showing that fair treatment by the district attorney's office was unlikely. While the appearance of impropriety in a prosecutor's conduct may be "highly destructive of public trust" (*People v. Eubanks* (1996) 14 Cal.4th 580, 593), "such apprehensions, alone" are not a basis for recusal of the district attorney's office under section 1424 (*Eubanks*, *supra*, at p. 593).

55

Thomas also invoked the ability of maternal grandparents to leverage their professional ties to the district attorney's office to ensure an aggressive prosecutorial campaign against him. Aside from the absence of substantial evidence to support this claim, we note that more significant conflicts of interests as presented in other cases have not succeeded in overcoming the high bar for recusal. In *Spaccia v. Superior Court* (2012) 209 Cal.App.4th 93 (*Spaccia*), the defendant, a city administrator, was prosecuted for alleged misconduct related to the hiring of the city's police chief. (*Id.* at pp. 96-97.) The defendant moved to recuse the district attorney's office based on allegations that the police chief had sought and received assurances from the district attorney to take the job before accepting the contract in question. (*Id.* at pp. 98-99.) The appellate court affirmed the denial of the recusal motion without an evidentiary hearing, finding that the defendant had offered no evidence to support her speculative theories about the police chief's alleged discussions with the district attorney (*id.* at pp. 107-108), and that even if her allegations were correct, they "failed to establish the second element necessary for recusal, a likelihood of unfair treatment, with any evidence beyond mere speculation." (*Id.* at p. 112.)

Here, like in *Spaccia*, there is no evidence to support Thomas's claim that the ties between maternal grandparents and the district attorney's office had influenced the prosecution or created a likelihood of unfair treatment to warrant recusal of the district attorney's office. Assuming the allegations are true, Elizabeth T.'s allegedly vindictive desire to terminate Thomas's parental rights to daughter, and her and David G.'s involvement in the initial communications with his supervisor about whom to call after daughter's disclosure, do not translate into a likelihood of unfair treatment at any point in the proceedings. The fact that the prosecuting attorney apparently provided scheduling or case updates to David G. is analogous to the police chief in *Spaccia* having contacted the district attorney for advice regarding his employment contract. (*Spaccia*, *supra*, 209 Cal.App.4th at p. 96.) While the act itself was arguably improper, there is no evidence to

support Thomas's speculation about the outcome of these updates and their effect on the trial. The trial court credited Tokhi's sworn statement that those limited interactions had had no effect on his prosecution of the case, and nothing more than speculation suggested otherwise. " '[A] motion to disqualify a prosecutor must be based upon a likelihood of unfairness and not upon mere speculation.' " (*Id.* at pp. 107-108; see *Haraguchi*, *supra*, 43 Cal.4th at p. 719 [reiterating it is "an *actual likelihood of unfair treatment*, not a subjective perception of impropriety" that can warrant the significant step of recusal].)

We conclude that the trial court did not abuse its discretion in denying Thomas's motion to recuse the district attorney's office without an evidentiary hearing. Though Thomas contends that his trial counsel should have challenged the denial of the recusal motion by filing a petition for a writ of mandate in the Court of Appeal (see, e.g., *People v. Trinh*, *supra*, 59 Cal.4th at p. 229), the failure to do so has no bearing on our review of the trial court's ruling on the motion itself. It follows that having found no error in the trial court's determination on the recusal motion, we find no merit in Thomas's claim of constitutional error.

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

Thomas contends that his trial counsel's deficient performance deprived him of his Sixth Amendment right to the effective assistance of counsel by (1) not filing a severance motion, (2) not filing a timely motion to introduce evidence pertaining to the alleged sexual abuse of stepson by Catalina F.'s former ex-husband, and (3) filing an inadequate recusal motion.

To prove a claim of ineffective assistance of counsel, Thomas must satisfy the two-pronged test set forth in *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*). First, he must show that his counsel's performance was deficient, implying "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Ibid.*) The question is whether "counsel's

57

representation fell below an objective standard of reasonableness." (*Id*. at p. 688.) Appellate scrutiny of defense counsel's performance under the first prong "must be highly deferential" (*id*. at p. 689) and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" (*ibid*.). The reviewing court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct" (*id*. at p. 690) and decide "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance" (*ibid*.).

Second, Thomas must affirmatively prove prejudice. (*Strickland*, *supra*, 466 U.S. at p. 693.) "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id*. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid*.) The reviewing court does not need to address both components of the inquiry into an ineffective assistance of counsel claim "if the defendant makes an insufficient showing on one." (*Id*. at p. 697.)

Here, Thomas is unable to demonstrate under the facts and circumstances of the case that his trial counsel's representation was less than professionally competent. Consequently, he cannot prove that "but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.)

### 1. Motion to Sever

Thomas contends that his trial counsel's failure to make a motion to sever resulted in unfairness amounting to a denial of due process. He avers that the charges at trial joined a weak case, as to daughter, with a stronger case, as to stepson, and that the joinder of both charges led the jury to be further inflamed against him given the purported sexual abuse of his biological daughter. He proposes that a severance motion could have been

58

granted if his counsel had challenged joinder on these grounds as a violation of his due process rights.

We find that defense counsel did not render ineffective assistance by declining to file a motion to sever the cases. When asked about this point during the first *Marsden* hearing, Prekoski stated that he believed a severance motion lacked merit and would not be successful because the evidence pertaining to each child was cross-admissible in the other case under Evidence Code section 1108. This assessment reflected a competent understanding of the rules governing joinder and severance.

Section 954 permits "two or more different offenses of the same class of crimes or offenses" to be charged and tried together in a single case. Although joinder is generally favored for reasons of judicial economy and efficiency, "a trial court has discretion to sever properly joined charges in the interest of justice and for good cause." (*People v. Simon* (2016) 1 Cal.5th 98, 122 (*Simon*); § 954.)

Thomas does not dispute that the statutory requirements for joinder were met here. His counsel would therefore have had to make "a clear showing of prejudice" to warrant severance. (*People v. Marshall* (1997) 15 Cal.4th 1, 27 (*Marshall*); see *Simon*, *supra*, 1 Cal.5th at p. 123 ["A defendant seeking severance of properly joined charged offenses must make a stronger showing of potential prejudice than would be necessary to exclude evidence of other crimes in a severed trial."].) The pertinent factors in deciding whether severance is appropriate are: "(1) whether the evidence relating to the various charges would be cross-admissible in separate trials, (2) whether any of the charges are unusually likely to inflame the jury against the defendant, (3) whether a weak case has been joined with a strong case or with another weak case, and (4) whether one of the charges is a capital offense or the joinder of the charges converts the matter into a capital case." (*Simon*, *supra*, 1 Cal.5th at p. 123.) "A determination that the evidence was cross-admissible ordinarily dispels any inference of prejudice." (*Marshall*, *supra*, at

p. 28.)  Indeed, "cross-admissibility of evidence is often an independently sufficient condition justifying a trial court's denial of severance . . . ."  (*Simon*, *supra*, at p. 123.)

Defense counsel in this case correctly ascertained that the evidence relating to each set of charges would have been cross-admissible in separate trials as sexual propensity evidence under Evidence Code section 1108.  In a sexual offense prosecution, the statute permits the admission of evidence that the defendant "committed other sexual offenses to prove his propensity to commit the charged sexual offenses" (*People v. Cottone* (2013) 57 Cal.4th 269, 281; see Evid. Code, § 1108, subd. (a)), so long as the evidence is not inadmissible pursuant to Evidence Code section 352.  The uncharged sexual offense conduct is therefore admissible if its probative value is not "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  Put differently, "[t]he evidence is presumed admissible and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters."  (*People v. Cordova* (2015) 62 Cal.4th 104, 132.)

The sexual offenses charged in this case satisfied the criteria for cross-admissibility, because the acts against daughter and stepson constituted sexual offenses within the meaning of Evidence Code section 1108 and were highly unlikely to be excluded under Evidence Code section 352.  The factors to be considered in deciding whether to exclude evidence of an uncharged sexual offense under Evidence Code section 352 include:  "(1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether

60

the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time." (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117 (*Nguyen*).)

Here, the probative value of the evidence cannot be seriously questioned. The crimes were similar in nature, in that each incident involved Thomas taking advantage of his position of trust and authority to sexually molest a child in his care. The sexual character of the offenses involving each child and the like manner in which they occurred (in Thomas's bedroom, at his verbal direction, ending in ejaculation), shows that the acts perpetrated on daughter were "similar enough . . . to tend to show the defendant" was predisposed to commit similar acts upon stepson, and vice-versa. (See *Nguyen*, *supra*, 184 Cal.App.4th at p. 1117.) Although the evidence related to stepson was arguably stronger and more inflammatory in terms of the specific lewd acts and the sodomy, the younger age of daughter and biological relationship is also highly inflammatory, and the relative proximity in time between the acts meant that the introduction of the uncharged acts would not have been found to be remote or stale. As our high court has explained, "the probative value of 'other crimes' evidence is increased by the relative similarity between the charged and uncharged offenses, the close proximity in time of the offenses, and the independent sources of evidence (the victims) in each offense." (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).)

Perhaps a closer question on the subject of prejudice, in a scenario where the charges as to each child were to be tried separately, is whether the introduction of evidence concerning the other child would inflame the jurors and tempt punishment for the conduct not charged in the case at hand. (See *Nguyen*, *supra*, 184 Cal.App.4th at p. 1117.) This concern is particularly apt if the other acts evidence was not adjudicated or did not result in conviction. (*Falsetta*, *supra*, 21 Cal.4th at p. 917 [noting "the prejudicial impact of the evidence is reduced if the uncharged offenses resulted in actual *convictions*" so the jury is not tempted to convict simply to punish the defendant for the

other offenses].)  However, there is nothing to suggest that the risk of such prejudice under the circumstances of this case *substantially* outweighed the probative value of the charges.  (See Evid. Code, § 352; *People v. Cordova*, *supra*, 62 Cal.4th at p. 132 ["The evidence is *presumed admissible* and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense . . . ."], italics added.)

In sum, the trial court's broad discretion to exclude propensity evidence under Evidence Code section 1108 if its prejudicial effect substantially outweighs its probative value would not have precluded cross-admissibility of the evidence in this case, had defense counsel moved to sever.  We moreover agree with the People that the evidence would have been cross-admissible in separate trials pursuant to Evidence Code section 1101, subdivision (b), which makes evidence of a crime or other act admissible to prove a fact such as intent or absence of mistake.  (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1222 [noting the " '*least degree of similarity*' " is needed for cross-admissibility to prove intent, as compared for other purposes]; see also *People v. Westerfield* (2019) 6 Cal.5th 632, 687-688 ["[W]e have expressly held that a connected intent or motivation, including a sexual motive, is sufficient in and of itself to establish the appropriateness of joinder"].)

As previously noted, cross-admissibility alone can provide a sufficient ground for the trial court to deny a severance motion.  (*Simon*, *supra*, 1 Cal.5th at p. 123.)  "[I]f evidence underlying the offenses in question would be 'cross-admissible' in separate trials of other charges, that circumstance normally is sufficient, standing alone, to dispel any prejudice and justify a trial court's refusal to sever the charged offenses."  (*Alcala v. Superior Court*, *supra*, 43 Cal.4th at p. 1221.)  This is true even where there is only one-way cross-admissibility, meaning that the "evidence underlying charge 'B' is admissible in the trial of charge 'A'—even though evidence underlying charge 'A' may not be similarly admissible in the trial of charge 'B.' "  (*Ibid*.)  Considering it is the

defendant's burden to show that evidence would not have been cross-admissible in a separate trial (*People v. Hartsch* (2010) 49 Cal.4th 472, 494), we conclude that the trial court undoubtedly would have found that the defense could not meet its burden to justify severance.

Nor would the other factors relevant to deciding whether severance is appropriate have dictated a different outcome. Thomas points out that daughter's case was considered too weak to file on its own and became viable only when joined with stepson's case. He contends that defense counsel should have argued that joinder of these weaker charges would inflame the jury against him, since they reflected sexual abuse of his biological daughter, and further created a synergistic effect that strengthened the entire case against him while greatly increasing his ultimate punishment.

To demonstrate prejudice from joinder based on these factors, Thomas "must show that one of the charged offenses was substantially more inflammatory than the other or was supported by significantly stronger evidence." (*People v. Elliott* (2012) 53 Cal.4th 535, 553.) We stated *ante* that neither set of charges is substantially more inflammatory. The alleged abuse of his position as father or stepfather was equally egregious in each case, as were the lewd acts charged and the young ages of the victims. Although the case involving stepson was stronger in terms of the older child's ability to recall and describe the sexual assaults, each set of charges relied on the same sort of evidence, namely direct testimony by the victim describing the acts and the victim's prior statements in interviews with law enforcement. (See *ibid.* [noting the strength and quality of prosecution evidence, in addressing the denial of a motion to sever, was similar because the charges related to two separate market robberies relied primarily on eyewitness testimony].)

We conclude that the charges related to daughter were not more likely to inflame the jury against the defendant, and the joinder of the arguably weaker case to the stronger case did not significantly bolster either, since the evidence as to each depended on the independent credibility of each victim's testimony. Considering in addition the

independently sufficient cross-admissibility of the charges, we find the "clear showing of prejudice" needed to obtain severance (*Marshall*, *supra*, 15 Cal.4th at p. 27; *Simon*, *supra*, 1 Cal.5th at p. 123) was simply lacking. Accordingly, Thomas fails to overcome the "strong presumption" on appeal (*Strickland*, *supra*, 466 U.S. at p. 689) that his trial counsel's refusal to file a motion to sever fell "outside the wide range of professionally competent assistance" (*id*. at p. 690).

### 2. *Motion to Introduce Evidence of Prior Sexual Conduct Based Upon Prior Allegations of Sexual Abuse Concerning Stepson*

Next, Thomas argues that during the *Marsden* hearings, he expressed concern that his trial counsel had not taken seriously the evidence indicating that Catalina F. had previously accused her former ex-husband, Curt W., of sexually abusing stepson, and that stepson had attended counseling as a result. When testimony related to the subject emerged at trial, defense counsel moved pursuant to Evidence Code section 782 to permit inquiry into the allegations of stepson's prior sexual abuse and counseling. On appeal, Thomas contends that his counsel provided ineffective assistance by failing to file the motion sooner and secure testimony about the past event between stepson and Curt W.

"A defendant generally cannot question a sexual assault victim about his or her prior sexual activity. [Citation.] However, a limited exception is applicable if the victim's prior sexual history is relevant to the victim's credibility. (Evid. Code, § 1103, subd. (c)(4); *People v. Chandler* (1997) 56 Cal.App.4th 703, 707 (*Chandler*).) In prosecutions brought pursuant to section 288, Evidence Code section 782 provides for a strict procedure that includes a hearing outside of the presence of the jury prior to the admission of evidence of the complaining witness's sexual conduct. [Citations.] Evidence Code section 782 is designed to protect victims of molestation from 'embarrassing personal disclosures' unless the defense is able to show in advance that the victim's sexual conduct is relevant to the victim's credibility." (*People v. Bautista* (2008) 163 Cal.App.4th 762, 781-782 (*Bautista*).) The theory of relevance in a child

64

molestation case is that the child victim "would not have knowledge of certain sexual practices other than as a result of the prior molestation." (*People v. Woodward* (2004) 116 Cal.App.4th 821, 831.)

Evidence Code section 782 thus authorizes a procedure by which a defendant seeking to introduce evidence of the victim's prior sexual conduct files a written motion accompanied by an affidavit containing an offer of proof concerning the relevance of the proffered evidence to attack the credibility of the victim. (Evid. Code, § 782, subd. (a)(1), (a)(2); *People v. Mestas* (2013) 217 Cal.App.4th 1509, 1514; see generally *People v. Fontana* (2010) 49 Cal.4th 351, 354.) If the court finds the offer of proof sufficient, it orders a hearing outside the presence of the jury to allow questioning of the complaining witness regarding the offer of proof. (Evid. Code, § 782, subd. (a)(3); *Fontana*, *supra*, at p. 354.) If it finds the evidence relevant and not inadmissible pursuant to Evidence Code section 352, the trial court may make an order stating what evidence may be introduced and the nature of the questions permitted. (Evid. Code, § 782, subd. (a)(4); *Fontana*, *supra*, at p. 354.) A trial court's ruling on the admissibility of prior sexual conduct will be overturned on appeal only if the defendant can show an abuse of discretion. (*Bautista*, *supra*, 163 Cal.App.4th at p. 782.)

The circumstances that the defense relied on to support the motion to introduce evidence of stepson's prior sexual "conduct" arose during the respective testimony of stepson and of Catalina F.

During stepson's cross-examination, defense counsel asked if he had previously said that "something like that had happened to you before; is that right?" Stepson replied, "Only with the shower part." Defense counsel followed up, "You had—the shower part had happened to you before?" Stepson replied, "Kind of like that, but they said it was actually with my first stepdad." Defense counsel asked, "Who was that?" And stepson replied, "Curt." At that point, the trial court sustained the prosecutor's relevance objection. After a sidebar discussion, defense counsel clarified to stepson that he was not

asking about a shower with someone else, only whether there was a shower with Thomas. Stepson responded, "only once."

During Catalina F.'s direct examination, she testified that her son's behavior changed in the fall of 2013 and that he seemed sadder, less confident, and less talkative. Defense counsel pursued this line of questioning on cross-examination, asking whether Catalina F. had ever seen her son behave like that before. She responded "No." Defense counsel then asked whether stepson "had some issues prior to that" because of treatment by Catalina F.'s prior husband and had received counseling from the women's crisis center as a result. The prosecutor objected on the ground of patient-therapist privilege, and the trial court declared a recess.

Outside the presence of the jury, the trial court and counsel discussed whether the prosecutor's direct examination about Catalina F.'s observations of her son's affect had opened the door for defense counsel to address the matter of his prior counseling on cross-examination. Defense counsel argued that Catalina F.'s testimony that stepson had not exhibited such behavior before contradicted information held by the defense which suggested that she had suspected her prior ex-husband, Curt W., of molesting stepson, had obtained a restraining order against him, and that stepson had attended counseling at the women's crisis center. Defense counsel argued the door had been opened to impeach Catalina F. by showing there was a prior "behavioral change attendant to the prior molestation" that resulted in the indicated therapy.

In support, defense counsel proffered that it had a certified declaration, filed during Catalina F.'s prior family court proceeding in 2008 and signed under penalty of perjury, requesting a restraining order against Curt W. It stated: " 'Curt is verbally and emotionally abusive to my son. When Curt and I lived together, [stepson] would never allow me to see his privates. Now that we are no longer living with Curt, [stepson] is not as concerned about me seeing his privates when I bathe him. This makes me believe there was something he was afraid of.' "

66

In addition, defense counsel had a letter from the women's crisis center, dated August 2008, acknowledging that stepson received counseling related to "either domestic or sexual abuse." Defense counsel suspected the prior and charged incidents were "quite similar" and thus relevant to the proceedings.

The prosecutor countered that it was not enough for defense counsel to invoke "similarity" without any offer of proof as to what the similarity was. The prosecutor emphasized that there was a patient-therapist privilege held by the victim (not his mother) as to the reason that stepson might have received counseling. He also questioned the probative value of relying on a divorce document from when stepson "was, at most, five years old" and argued it was unduly prejudicial and confused the issues, especially because stepson never indicated that he was confused about who had molested him.

The trial court addressed whether the change-in-behavior testimony had opened the door for cross-examination. It ruled that the defense could probe about changes in behavior but not about the prior marriage or stepson's therapy in August 2008. The court explained that to the extent stepson participated in therapy, it was remote in time, protected by privilege, and did not impeach Catalina F. since it did not necessarily show there was a change in stepson's behavior. The court limited its ruling to the open door for cross-examination and stated that would address the related issues at a hearing on a defense motion pursuant to Evidence Code section 782, which defense counsel had indicated would be filed that afternoon.

In a closed hearing the next day, the trial court considered the defense's motion to admit evidence of stepson's prior sexual conduct pursuant to Evidence Code section 782. The prosecutor filed written opposition, arguing that the motion was procedurally and substantively flawed. The prosecutor claimed the motion was brought in bad faith late in the trial and that it improperly sought to elicit testimony *not* from the "complaining witness" per the statute, but from his mother. The prosecutor also challenged the probative value of the claim that stepson was the victim of molestation by his prior

67

stepfather, noting it was based solely on conjecture from a sentence in a court filing when stepson was four years old, and no other evidence (such as a complaint or police report) was ever put forth. The prosecutor argued that stepson's alleged, prior victimization had no bearing on the issue of his credibility because he never expressed confusion about the perpetrator of the charged offenses. The prosecutor averred that such unsubstantiated evidence of a potential, prior sexual assault was unduly prejudicial and likely to confuse the jury, and thus should be excluded under Evidence Code section 352. The prosecutor also reminded the trial court that it had sustained his objection to stepson's testimony about having to shower with his first stepfather, and thus there was no evidence before the jury about it.

Defense counsel challenged the idea that the motion was untimely, citing stepson's testimony about the shower and Catalina F.'s testimony that she had not previously witnessed such behavioral changes in her son. He argued that evidence of the prior molestation was not so remote, in relation to stepson's youthful age, and that what appeared to be similarities between the accounts told by stepson to his mother concerning Curt W. and Thomas warranted "probing . . . appropriately" into allegations made about the prior event. Defense counsel expected the probing would reveal "a great degree of factual similarity" and bolster the defense's theory that stepson was "conflating the two events." He stated that it was not the defense's intent to claim that stepson was unable to distinguish between his stepfathers, but to suggest that tensions between stepson and Thomas due to corporal punishment or other issues could have triggered a trauma response connected to the earlier trauma. Defense counsel believed that the coincidence about the shower indicated there was more to the story, since the shower was allegedly the way the molestation "wrapped up" and was likely not all that had happened. By way of an offer of proof, defense counsel stated, "My client has indicated that it was discussed within his family that a story was told about what happened with [Curt W.], who [stepson] referred to as 'the bad man.' " Catalina F. apparently acknowledged the story

of the molestation and further sought the restraining order as part of the divorce proceeding.

The prosecutor protested that this information to support the motion was supplied by Thomas, who had a motive to fabricate and in fact had fabricated Catalina F.'s declaration, according to earlier testimony. He urged that the purpose of Evidence Code section 782 was to protect victims from such inquiries that are unrelated to the allegations of the case.

After asking further questions of defense counsel and taking the matter under submission, the trial court denied the motion. It found there was "no credible showing or credible offer of proof of substantial similarity" between the allegations at issue and what might have happened over eight years ago, noting that the defense would be relying on the defendant's own testimony in seeking to cross-examine stepson about something that may have happened when he was four or five years old. The court also found that neither Catalina F.'s declaration for a restraining order nor the letter from the women's crisis center established that sexual abuse had occurred. The family court document stated only that Curt W. had been "verbally and emotionally abusive" to stepson and that Catalina F. "believed" he may have been afraid of something where he would not allow her to see his privates while bathing. The letter from the women's crisis center appeared to have been submitted around the time that Catalina F. was seeking a restraining order for what appeared to be primarily a complaint of physical abuse against her. And because the letter referred to counseling for "either sexual abuse or . . . domestic violence abuse," the court reasoned it was insufficient to show the counseling related to sexual abuse. The court concluded that it would deny the motion on that basis, as well as under Evidence Code section 352 because it would require an undue consumption of time in what was the final week of trial and would be confusing to the jury in that it would require a "mini trial of something else that happened long, long ago, if it did happen at all . . . ."

69

We find that Thomas was not prejudiced by any failing on the part of his trial counsel to file a timely or more effective motion, because the factual basis for seeking to introduce evidence of the victim's prior sexual conduct was entirely inadequate. (See *Strickland*, *supra*, 466 U.S. at p. 694 ["The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."].)

The critical showing for purposes of securing an opportunity to introduce evidence of the victim's prior sexual conduct is "the relevancy of evidence of the sexual conduct . . . proposed to be presented and its relevancy in attacking the credibility of the complaining witness." (Evid. Code, § 782, subd. (a)(1).) The statute defines "complaining witness" in relevant part as "[t]he alleged victim of the crime charged . . . ." (*Id.*, § 782, subd. (b)(1).) In short, the defense must be able to demonstrate, in advance via the offer of proof, that the victim's sexual conduct (or in this case, alleged prior sexual molestation) is relevant to the victim's credibility. (*Id.*, § 782 subd. (a)(2), (a)(3); see *Bautista*, *supra*, 163 Cal.App.4th at p. 782.)

Here, the offer of proof submitted by the defense was insufficient. The defense sought to use evidence that stepson had participated in therapy in 2008, when he was a young child of four or five years old, to attack Catalina F.'s credibility for testifying that she noticed him become sad and withdrawn in 2013, when he was 10 years old, in a way she had never seen before. The premise of using stepson's prior therapy and presumed, emotional state at the time to impeach Catalina F. was flawed because Evidence Code section 782 addresses only the credibility of the complaining witness—in this case, stepson. We recognize that defense counsel sought to shift the focus to stepson's credibility by suggesting that his alleged, prior trauma by Curt W. may have clouded his response to stresses in his relationship with Thomas, causing him—perhaps inadvertently—to conflate his stories into what defense counsel called "startingly similar" accounts. However, the offer of proof failed to establish such similarity, or even the fact

70

of a prior molestation, and further failed to demonstrate its relevancy in attacking stepson's credibility in his allegations against Thomas.

Catalina F.'s sworn statement in filing for a restraining order in 2008 and the letter from the women's crisis center at most established that (1) Catalina F. feared a molestation had occurred and (2) counseling for either sexual abuse or domestic violence was provided. As the trial court aptly noted, this offer of proof could not be construed as a basis to permit the defense to question stepson about prior molestation because it failed to indicate by more than supposition that stepson had experienced the prior sexual conduct to begin with. (Evid. Code, § 782, subd. (a)(3) [a trial court's finding of a sufficient offer of proof leads to a closed hearing for the defense to question *the complaining witness* about the offer of proof to ascertain relevancy and prejudice].)

There was also no factual basis in the offer of proof to support defense counsel's conjecture that stepson's alleged, prior molestation resembled the acts charged to Thomas. (See *People v. Daggett* (1990) 225 Cal.App.3d 751, 757 [holding that evidence of a prior molestation is relevant to the victim's credibility and should be admitted "if the acts involved in the prior molestation are similar to the acts of which the defendant stands accused . . . ."].) Stepson's testimony at trial and his interviews during the investigation described three sex acts with Thomas: he was sodomized; he was orally copulated; and he was made to masturbate Thomas's penis. There is no basis in the record or offer of proof from which to infer that any prior victimization that stepson might have experienced consisted of these or similar acts. Moreover, while stepson's testimony revealed some uncertainty about the number of times the abuse by Thomas occurred, it left no basis to infer that he had confused or conflated that abuse with anything that had occurred earlier in his childhood.

We conclude that the information offered in support of the motion was plainly insufficient to satisfy the strict standard for introducing evidence of the complaining witness's sexual conduct under Evidence Code section 782. Earlier filing of the motion

71

and offer of proof would not have altered the outcome where the proof itself was deficient. Under these circumstances, and indulging a "strong presumption" that counsel's tactical choices fell within the "wide range of reasonable professional assistance" (*Strickland*, *supra*, 466 U.S. at p. 689), it is unsurprising that defense counsel refrained from filing a motion, then changed course when testimony at trial appeared to create a window of opportunity. Consequently, Thomas cannot affirmatively prove prejudice (*id*. at p. 693) due to ineffective advocacy of the motion to introduce prior sexual conduct evidence.

### 3. *Motion to Recuse the District Attorney's Office*

Thomas lastly contends that if defense counsel had prepared a thorough and competent recusal motion, he would have stood a "reasonable chance" of obtaining an evidentiary hearing pursuant to section 1424 and securing the recusal of the Monterey County District Attorney's office. This contention is without merit.

As we explained in detail, the motion to recuse the district attorney's office was properly denied without an evidentiary hearing. (See *ante*, part II.B.2.) Thomas claims that defense counsel essentially undersold the motion by omitting critical and relevant information about the conflict of interest. For example, he states that trial counsel should have alleged that from the time of daughter's disclosure on March 31, 2014, to the implementation of the "ethical wall" on or about September 24, 2014, there were "significant communications between" Aimee T., Catalina F., Elizabeth T., and "likely" the district attorney's office. Yet Thomas fails to point to or describe even a single communication that supports this bold statement. He avers that "[t]he history of the case reflected a conscious and calculated effort to gather incriminating evidence" against him so he could be prosecuted for the reported crimes against daughter and exposed to much greater punishment. Again, this claim is unsupported by a single record citation or even by some broader pattern of actions or indirect evidence that could bolster an inference of

72

calculated effort and collusion. Although Thomas asserts theories by which the district attorney's office allegedly engaged with Aimee T. and Catalina F. to procure the evidence needed to prosecute Thomas, and to bestow favors in return (like the assistance that Elizabeth T. apparently provided Catalina F. to transfer stepson to a new school), none are grounded in a cognizable way to the facts and procedural history supplied by the record.

Thomas contends that his trial counsel should have pleaded "the communications between [daughter]'s family and Catalina [F.] as a basis for an evidentiary hearing." Such a pleading for purposes of a recusal motion would have required supporting "affidavits of witnesses who are competent to testify to the facts set forth" therein. (§ 1424, subd. (a)(1).) It is unclear how defense counsel's purported failure to do so was deficient (see *Strickland*, *supra*, 466 U.S. at p. 688) when there appears to be no factual basis in the record that could have supported it. To the contrary, the record shows that Catalina F. and Aimee T. communicated once during the time period that Thomas references. Catalina F. texted Aimee T. on August 16, 2014, after stepson disclosed Thomas's abuse. She told Aimee, "My apologies for what happened to [daughter]" and expressed her belief that what daughter said was true. Catalina F. further testified that she did not speak with Aimee T. before that point about daughter's allegations.

In sum, Thomas fails to show that his trial counsel's performance was deficient in relation to the motion for recusal. The contention that trial counsel omitted critical material from the recusal motion appears itself to depend on speculation and suspicion. The reviewing court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. . . ." (*Strickland*, *supra*, 466 U.S. at p. 690.) The record of the first *Marsden* hearing and defense counsel's subsequent filing of the recusal motion, viewed together, suggest to this court that defense counsel sought, in light of the circumstances, to pursue his client's desired course to seek recusal of the district attorney's office, while necessarily

constrained by the limited factual record available to support the claimed conflict of interest. We conclude that the omissions identified by Thomas were not outside the wide range of professionally competent assistance when defense counsel filed the recusal motion (*ibid.*), because they could not be supported by competent evidence. Thomas has not carried his burden to demonstrate ineffective assistance of counsel on that basis.

### D. CUMULATIVE ERROR

Thomas contends that even if none of the individual errors asserted are deemed sufficient to reverse the judgment, the cumulative prejudicial effect of the errors rendered his trial fundamentally unfair.

Our Supreme Court has explained cumulative prejudice in terms of the standard for reversible error: "Lengthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice. (Cal. Const., art. VI, § 13; see also *Chapman v. California* (1967) 386 U.S. 18, 24 [harmless-beyond-a-reasonable-doubt standard applies to review of federal constitutional error].) Nevertheless, a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844 (*Hill*), overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

Cumulative error thus depends on any number of errors whose aggregate prejudicial effect must be considered in deciding whether the defendant's "guilt or innocence was fairly adjudicated." (*Hill*, *supra*, 17 Cal.4th at p. 844.) In *Hill*, the court found that "the sheer number of instances of prosecutorial misconduct and other legal errors raise[d] the strong possibility the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone." (*Id.* at p. 845.) The high court concluded that the cumulative impact of errors during the guilt and penalty phases had in fact deprived the defendant in *Hill* of a fair trial. (*Id.* at p. 847.)

74

Thomas argues that the errors identified in his trial together operated to deny him due process, a fair trial, the effective assistance of counsel, and a reliable sentencing determination in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The premise of cumulative error fails, however, where the defendant has not established error and there is no cumulative prejudicial impact to gauge. (See *People v. Salcido* (2008) 44 Cal.4th 93, 156 [rejecting cumulative error claim for guilt phase of capital trial, because the defendant had not established error].)

### III.   DISPOSITION

The judgment is affirmed.

_____
                                        Premo, J.

WE CONCUR:


_____
        Greenwood, P.J.


_____
        Elia, J.


People v. Thomas
H044094